ROBERTO SÁNCHEZ VILELLA, NOEL COLÓN MARTÍNEZ, demandantes y apelantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, COMISIÓN ESTATAL DE ELECCIONES y OTROS, demandados y apelados; ROBERTO SÁNCHEZ VILELLA, NOEL COLÓN MARTÍNEZ, demandantes y apelantes, FEDERACIÓN DE UNIVERSITARIOS PRO–INDEPENDENCIA, interventora y apelante, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, COMISIÓN ESTATAL DE ELECCIONES y OTROS, demandantes y apelados.

*Números:* AC-93-654      *Resueltos:* 10 de noviembre de 1993
AC-93-644

## RESOLUCIÓN

A las mociones de reconsideración presentadas por los codemandantes Roberto Sánchez Vilella y Noel Colón Martínez, y la segunda moción de reconsideración de la Federación de Universitarios Pro Independencia, el Tribunal provee no ha lugar a las mismas.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García reconsideraría y paralizaría la celebración del Plebiscito de 14 de noviembre de 1993. El Juez Asociado Señor Rebollo López reitera lo expresado en el Voto preliminar disidente que emitiera el 4 de noviembre de 1993.

Conforme las reservas que hicieran los Señores Jueces en la Sentencia de 4 de noviembre de 1993, al amparo de la Regla 4(b) del Reglamento del Tribunal Supremo, el Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton emitieron opiniones de conformidad. Los Jueces Asociados Señor Negrón García y Señor Rebollo López emitieron opiniones disidentes.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión de conformidad emitida por el Juez Presidente Señor Andréu García.

I

El 4 de julio de 1993 se aprobó la Ley Núm. 22 (1993 Leyes de Puerto Rico 101–113), autorizando la celebración de un plebiscito en el cual el Pueblo de Puerto Rico pudiera expresarse sobre el *status* político de su preferencia.([1])

---

([1]) Los términos "plebiscito", "referéndum" y "consulta" tienen significados diferentes.

"Tanto en un plebiscito, como en un referéndum, los ciudadanos únicamente pueden responder 'sí' o 'no'; no hay más opciones, aunque, desde luego, puede ejercerse la abstención, *así como el voto en blanco*, o la anulación voluntaria del voto. Si al ciudadano se le presentan en la papeleta de votación varias opciones, en ese caso la consulta recibe el nombre particular de *opción*, que es diferente al plebiscito y al referéndum. [En Puerto Rico], el 23 de julio de 1967 se celebró lo que se llamó un plebiscito, que en sentido estricto fue una opción, con relación a la condición jurídico-política de la Isla. Se puede afirmar que dicha consulta no cumplió con los requisitos necesarios para ser tenido como verdadero plebiscito. ... En cuanto al formato que

En dicha ley se dispuso para que los electores capacitados pudiesen votar entre las tres (3) fórmulas tradicionales que han existido en Puerto Rico: la Estadidad, el Estado Libre Asociado y la Independencia. Se dispuso, además, que era la facultad primaria de los partidos políticos principales redactar unas definiciones de las fórmulas de *status* y llevar a cabo una campaña de promoción para cada una de las fórmulas. Dicha campaña se llevaría a cabo con la ayuda de un fondo electoral asignado por la Asamblea Legislativa con el fin de sufragar en parte los gastos de información al elector.

Según la ley, la participación representativa de otros grupos, organizaciones o entidades aparte de los partidos políticos que participaron en las últimas elecciones generales y que aparecen debidamente inscritos por virtud de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 *et seq.*, quedó sujeta a que éstos últimos hubiesen optado por no representar las fórmulas correspondientes.

En el caso de autos, los tres (3) partidos tradicionales de Puerto Rico: el Partido Nuevo Progresista, el Partido Popular Democrático y el Partido Independentista Puertorriqueño, notificaron su interés de participar en el proceso sometiendo sendas definiciones de las fórmulas de *status*. De esa forma, y conforme a la Ley Núm. 22, *supra*, impidieron el acceso a otras organizaciones no partidistas al proceso antes descrito.

El 15 de septiembre de 1993 Roberto Sánchez Vilella y Noel Colón Martínez, ambos en representación propia, presentaron demanda de interdicto preliminar y permanente ante el Tribunal Superior cuestionando la constitucionalidad y legalidad de la ley plebiscitaria. Alegaron que se les privó de su derecho al voto ya que, al no creer en ninguna de las definiciones de las fórmulas presentadas por los partidos, se veían obligados a abstenerse de votar.

---

tuvo la consulta fue más bien una opción que un plebiscito. (Énfasis suplido.) R. Garzaro, *"Plebiscito y Referéndum"*, 50 (Núms. 1–2) Rev. C. Abo. P.R. 3, 11 (1989).

Además, en su demanda, los demandantes atacaron la "Ley del Plebiscito" por violar los preceptos de derecho internacional siguientes:

a.   Las definiciones de las fórmulas políticas no están basadas en el principio de soberanía y están subordinadas al poder del Congreso de los Estados Unidos bajo la cláusula territorial de la Constitución Federal.

b.   El plebiscito del 14 de noviembre próximo establece un mecanismo de participación electoral dentro de un marco político en el que Estados Unidos ejerce la soberanía sobre el Pueblo de Puerto Rico, sin que haya una transferencia de los poderes soberanos al Pueblo u organismo representativo de la soberanía del Pueblo.

c.   Al plebiscito no le precede la erradicación de las condiciones existentes que vician el libre ejercicio de la autodeterminación tales como la presencia militar norteamericana en Puerto Rico y la vigencia de legislación de los Estados Unidos.

d.   No existe un compromiso del Congreso de Estados Unidos de honrar la voluntad del Pueblo según [é]sta sea expresada en el plebiscito. Demanda, pág. 13.

El 21 de septiembre de 1993 se celebró una vista en la que las partes argumentaron sus planteamientos de derecho. Ese mismo día, la Federación de Universitarios Pro Independencia (F.U.P.I.) solicitó intervenir en el pleito. Atacaron la constitucionalidad de la Ley Núm. 22, *supra*, por ésta limitar la participación en el proceso de diseñar las definiciones de las fórmulas de *status* a tres (3) partidos, entendiendo que el contenido de las mismas no recogía su definición particular del *status*.

En su demanda, la F.U.P.I. incorpora lo alegado por los apelantes Roberto Sánchez Vilella y Noel Colón Martínez, y ataca, a su vez, la utilización del proceso plebiscitario por considerarla una forma inefectiva de descolonización.[2]

---

[2] En su Demanda de Intervención la Federación de Universitarios Pro Independencia (F.U.P.I.) expone:

4.   Las actuales fórmulas expuestas bajo la Ley del Plebiscito, Ley Núm. 22, de 4 de julio de 1993, no contemplan los siguientes renglones que la interventora considera esenciales para un proceso democrático descolonizador, entre otros: (a) La excarcelación de los presos políticos y de guerra puertorriqueños; (b) la participación como votantes de los puertorriqueños residentes en los Estados Unidos; (c) formas

El 21 de octubre el Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, Juez), desestimó la demanda por falta de legitimación activa de los demandantes, denegando a su vez la solicitud de intervención.

No conforme con esto, los demandantes Sánchez Vilella y Colón Martínez, así como la F.U.P.I. apelaron ante este Tribunal.

## II

El derecho de participar en el proceso electoral, elemento base de nuestro sistema democrático que surge del derecho al voto y de la libertad de asociación, es fundamental en nuestro esquema de Derecho constitucional. *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173 (1979); Emdas. I y X, Const. EE.UU., L.P.R.A., Tomo 1;[3] Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1.

En el contexto de participación política, el derecho al voto no tan sólo comprende el derecho del elector a votar en

---

más democráticas de distribución de los fondos y organización de la ley habilitadora del plebiscito; (d) medidas encaminadas a desmilitarizar a Puerto Rico tales como: la devolución de las tierras en poder del ejército de los Estados Unidos al pueblo puertorriqueño como fundamental para la preservación y mejoramiento del ambiente y la producción agrícola, la eliminación del servicio militar obligatorio de los puertorriqueños en el ejército de los Estados Unidos y no condicionar las ayudas económicas estudiantiles a la inscripción previa de ese cuerpo militar extranjero; (e) salida de Puerto Rico de los cuerpos represivos extranjeros como la C.I.A., F.B.I., Servicio Secreto, R.O.T.C. y agencias de espionaje e inteligencia de los Estados Unidos; (f) procurar el cumplimiento de las disposiciones de Derecho Internacional de las Naciones Unidas relativas al ejercicio del derecho de autodeterminación del pueblo puertorriqueño. Demanda de Intervención, pág. 2.

[3] En la jurisdicción federal, el derecho al voto y a la libre asociación política son dos (2) derechos distintos pero coincidentes:

... el derecho de los individuos de asociarse para la promoción de creencias políticas y el derecho del elector capacitado, sin miras a su persuasión política, a emitir su voto de forma efectiva. (Traducción nuestra.) *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

Estos derechos surgen del derecho de asociación de la Primera Enmienda de la Constitución federal y se hizo extensivo a los estados a través de la Decimocuarta Enmienda. Así, en *N.A.A.C.P. v. Alabama*, 357 U.S. 449 (1958), el Juez Harlan expresó que la libertad de asociarse para lograr la propulsión de las ideas y creencias es inseparable del aspecto de libertad garantizado por la cláusula del debido procedimiento de ley de la Decimocuarta Enmienda.

las elecciones, sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas del elector. *Lubin v. Panish,* 415 U.S. 709 (1974). A su vez, el derecho a asociarse se refiere al derecho a formar agrupaciones para participar en el proceso electoral.

El Tribunal Supremo federal ha determinado que aunque es indudable el carácter fundamental que conlleva su ejercicio, este derecho a votar de una manera determinada y el derecho a asociarse para propósitos políticos a través de una papeleta electoral no es absoluto. *Munro v. Socialist Workers Party,* 479 U.S. 189 (1986); *Burdick v. Takushi,* 504 U.S. 428 (1992). A tenor con esto, ese Tribunal ha reconocido el poder de los estados de regular las elecciones dentro de sus jurisdicciones. *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208 (1986). La razón de permitirle al Estado la facultad de reglamentación del proceso electoral responde a la necesidad práctica de ordenar el mismo con miras a evitar la confusión y el caos.

Bajo este poder de reglamentación, al gobernar el acceso de los grupos, candidatos o fórmulas a las papeletas, el Estado se coloca en una posición que por su naturaleza tiene el efecto de restringir e imponer cargas sobre el derecho a participar en el proceso electoral.

Es por esta razón que en varias ocasiones el más alto tribunal federal se ha expresado al efecto de que en casos en que se impugna la constitucionalidad de una ley electoral que crea barreras y restricciones al acceso a las papeletas no se impone automáticamente el deber a los tribunales de aplicar un escrutinio estricto. *Bullock v. Carter,* 405 U.S. 134 (1972); *Anderson v. Celebrezze,* 460 U.S. 780 (1983); *Burdick v. Takushi,* supra.

> ...El someter cada reglamento electoral al escrutinio estricto y el requerir que dicha reglamentación sea diseñada estrechamente para promover un interés apremiante del Estado ... le ataría las manos a los estados que quieren garantizar que las

elecciones se lleven a cabo de forma equitativa y eficiente. (Traducción nuestra.) *Burdick v. Takushi*, supra, pág. 433.

Es necesario que los tribunales lleven a cabo un proceso analítico en la determinación del estándar a seguir. *Anderson v. Celebrezze*, supra.

El Tribunal Supremo federal ha entendido que este proceso de análisis requiere primero considerar bajo la Primera y Decimocuarta Enmienda la naturaleza y magnitud del daño alegadamente sufrido por los demandantes. *Anderson v. Celebrezze*, supra. Es únicamente ante una restricción severa e irrazonable que se sujetaría la reglamentación al más riguroso escrutinio. Véase *Norman v. Reed*, 502 U.S. 279 (1992). El rigor del análisis, por ende, dependería de la dimensión del perjuicio ocasionado a los derechos invocados.

De determinarse que el estatuto impone una restricción razonable y no discriminatoria al acceso a las papeletas, se aplicaría el estándar del balance de intereses. *Anderson v. Celebrezze*, supra. Bajo dicho criterio, los tribunales procederían a identificar y evaluar los intereses gubernamentales que pudiesen justificar la imposición de la reglamentación, pesándolos frente a los daños al derecho al voto y a la libre asociación. Debe determinarse, además, si dichos intereses son legítimos y si la intensidad justifica la imposición de un gravamen a los derechos invocados. Cónsono con esta norma se ha señalado que un interés importante del Estado sería suficiente para sostener la validez constitucional de la reglamentación. Íd.[4] Véase, también, *Bur-*

---

[4] En el caso de *Anderson v. Celebrezze*, 460 U.S. 780 (1983), el Tribunal hizo determinaciones sobre la constitucionalidad de una ley de Ohio que le requería a los candidatos a la Presidencia presentar una declaración de candidatura y nominación por petición dentro de una fecha límite. Debido a que el candidato demandante no presentó a tiempo su declaración al respecto, se le impidió aparecer en la papeleta. El Tribunal entendió que dicho estatuto violaba los derechos constitucionales al voto y a la libre asociación, considerando que la necesidad de una fecha límite temprana no era suficiente para superar la restricción al proceso nacional electoral y al interés de los electores de asociarse para expresar su apoyo a un candidato y sus ideas.

*dick v. Takushi*, supra.([5])

## III

A tenor con la doctrina antes expuesta, debemos establecer cuáles, según el texto de la ley, representan las posibles barreras y restricciones que ésta impone sobre los electores en torno a la consulta plebiscitaria a celebrarse el 14 de noviembre de 1993.

De entrada, recalcamos que la Legislatura, al aprobar la Ley del Plebiscito de 1993, dispuso que el elector tendría la oportunidad de expresarse sobre una de las tres (3) fórmulas tradicionales que se han venido debatiendo en Puerto Rico por las últimas cinco (5) décadas, a saber: la Estadidad, el Estado Libre Asociado de Puerto Rico y la Independencia. Por consiguiente, la papeleta, que se limita a tres (3) columnas correspondientes a cada una de las opciones políticas mencionadas, no permitiría una expresión afirmativa en torno a otra posible fórmula.

Por otro lado, el Art. 3 de la Ley Núm. 22, *supra*, 1993 Leyes de Puerto Rico 103–104, dispone para que los tres (3) partidos políticos que durante décadas han propulsado en nuestra Isla dichas opciones sean los que le sometan a la Comisión Estatal de Elecciones una definición concisa y clara sobre las aspiraciones de dichos organismos en torno a esas opciones políticas.

Según el marco legal delineado, nos toca ahora discernir la naturaleza y la magnitud del daño que los demandantes alegan que sufrirían debido a la primera limitación que la

---

([5]) En el caso de *Burdick v. Takushi*, 504 U.S. 428 (1992), el Tribunal Supremo federal sostuvo la validez constitucional de una ley de Hawaii que prohibía la opción de libre acceso (*write-in*) y que requería que un candidato participara en las primarias para lograr que apareciera su nombre en la papeleta de las elecciones generales. Determinó el Tribunal que el daño causado a los candidatos al no permitir el acceso a la papeleta no era una restricción irrazonable de sus derechos de Primera y Decimocuarta Enmiendas por ser de naturaleza limitada. Además, los intereses legítimos del Estado, como por ejemplo evitar la dilución del voto, superaban el interés del elector de poder escoger a un candidato en una fecha tan cercana al evento electoral.

ley aparenta imponer: el hecho de que la misma restringe la votación a tres (3) columnas en las que solamente aparecerían las fórmulas ya mencionadas. En torno a esa situación los apelantes alegan que se verían privados absolutamente de votar por las definiciones y/o fórmulas de su preferencia sin que la Legislatura les hubiera concedido la oportunidad de tener otro acceso a la papeleta.

El daño que los apelantes esbozan parece ser, de primera impresión, de gran magnitud. Ahora bien, para poder abordar el tema en torno a la proporción del alegado daño debemos poner ante nosotros la interrogante siguiente: ¿Resulta razonable que la Legislatura haya limitado las opciones del electorado a aquéllas que han sido históricamente discutidas y diseminadas a través de todos los foros y medios de comunicación por las últimas décadas? Si resolvemos en la afirmativa, entonces claramente el supuesto daño que pudiesen sufrir los demandantes no tiene la dimensión alegada por éstos, por lo que procedería sopesar los intereses implicados para poder hacer una determinación en torno a la constitucionalidad del estatuto impugnado. De otra manera, tendríamos que someter tal estatuto a un escrutinio estricto. Veamos.

## IV

La ley sobre la cual hoy nos expresamos debe ser analizada tomando en cuenta la realidad histórica y política de nuestro Pueblo. No es que vayamos a limitar nuestra revisión a aquello que resultaría ser "práctico", sino que hay que entender que el Derecho no es un instrumento creado por seres imaginarios para ser aplicado en las tinieblas de lo abstracto. Debemos tener presente que el estatuto en cuestión es producto del proceso político de la Rama Legislativa dirigido por los líderes de nuestro País, los que, a su vez, están sometidos a las realidades históricas de Puerto Rico.

Como ya hemos señalado, la ley ante nuestra consideración permite la expresión sobre las tres (3) fórmulas de *status* que tradicionalmente se han discutido en todos los foros de nuestra Isla. El criterio utilizado por el legislador se fundamenta, en cuanto a las fórmulas contenidas en la papeleta de votación, en el debate histórico al que nuestro Pueblo ha sido expuesto. No se trata de impedir el derecho a la expresión de ideales que, aunque nunca han tenido un respaldo sustancial de nuestro Pueblo, han sido tradicionalmente sostenidos por un sector minoritario del mismo. Todo lo contrario: el derecho de las minorías está plenamente garantizado. La Ley del Plebiscito de 1993 otorga los mismos derechos a las tres (3) fórmulas propuestas a pesar de que el partido político que promulga la Independencia no ha tenido un respaldo mayor al cinco porciento (5%) del electorado a través de las últimas décadas. Es obvio que la intención del Legislador era incluir todas las fórmulas que seriamente se han discutido en nuestro país, irrespectivamente del respaldo electoral que éstas gozan. Así lo hizo.

Por otro lado, los apelantes no parecen estar de acuerdo con la consulta, lo que deja en entredicho el alegado daño sufrido por éstos como consecuencia de la exclusión de otras fórmulas. A esos efectos, en su demanda original los apelantes sugirieron que la consulta sería un ejercicio fútil de los electores puertorriqueños ya que, según ellos, "no existe un compromiso del Congreso de los Estados Unidos de honrar la voluntad del Pueblo según ésta sea expresada en el plebiscito".

Por estas razones, resolvemos que el daño que alegan sufrir los demandantes, en cuanto a este primer obstáculo, no es severo e irrazonable. Véase *Burdick v. Takushi*, supra. Pasemos ahora a discutir la magnitud del daño que la segunda carga que presenta la ley le ha causado a los apelantes.

# V

Según los apelantes, la disposición que le permite a los partidos políticos definir las tres (3) fórmulas propuestas restringe severamente su derecho al voto y a la libre asociación, ya que ellos alegan que no se les permitió participar en el debate político que culminó en las definiciones específicas de cada una de las tres (3) fórmulas.

Al aprobar la Ley del Plebiscito de 1993, la Asamblea Legislativa reconoció, como hemos dicho, que hay tres (3) fórmulas históricas entre las que se ha debatido nuestro Pueblo durante generaciones.

Se dispuso en dicha legislación que los partidos, como instrumentos políticos que históricamente han representado y funcionado en gran medida en torno a las tres (3) opciones políticas de *status*, debían informar a la Comisión Estatal de Elecciones, dentro de un plazo de treinta (30) días dispuesto en la ley, la definición de la fórmula de *status* que promulgarían y defenderían durante la campaña política. *Al igual que la Ley del Plebiscito de 1967*,(6) la Ley del Plebiscito de 1993 dispuso que las agrupaciones que cumpliesen con determinados requisitos podrían defender una de las tres (3) fórmulas de *status* en caso de que uno de los tres (3) partidos políticos optara por no participar en la consulta. Los tres (3) partidos políticos principales de Puerto Rico: el Partido Nuevo Progresista, el Partido Popular Democrático y el Partido Independentista Puertorriqueño, optaron por participar en la consulta, viabilizando de esta forma la representación vigorosa de las "tres corrientes ideológicas principales de nuestro desarrollo histórico"(7) a través de las colectividades que tradicional-

---

(6) Ley Núm. 1 de 23 de diciembre de 1966 (16 L.P.R.A. ants. secs. 844–938).

(7) Véase la Exposición de Motivos de la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico, pág. 102.

mente han aglutinado a los seguidores de las tres (3) opciones de *status*.

La "libre participación del ciudadano en las decisiones colectivas" está cobijada bajo nuestra Constitución, que reconoce el derecho al sufragio universal, igual, directo y secreto.[8] Dicho derecho constitucional al sufragio está garantizado no sólo en las elecciones generales sino, además, en plebiscitos y consultas como la dispuesta por la Ley del Plebiscito de 1993. Ahora bien, la participación del elector en decisiones colectivas, para hacerse efectiva y dinámica, se ha canalizado tradicionalmente a través de los partidos políticos.[9] Independientemente de la erosión de poder que puedan sufrir los mismos en algunos de los sistemas políticos contemporáneos, la realidad inescapable es que "[l]a

---

"Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomado cuerpo colectivo, y previa inscripción, participa[n]do como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338 (1970)." *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 624 (1978), opinión concurrente del Juez Asociado Señor Negrón García.

Desde principios del Siglo XX, "Puerto Rico se enfrenta a la triple disensión que ha afectado nuestra política desde entonces: anexionismo, autonomismo y separatismo .... En 1967 nuestro pueblo aprendió que la cuestión del status puede plantearse con votos limpios en un procedimiento dedicado a ese propósito: el plebiscito. No debe subestimarse el impacto que este acontecimiento histórico tiene que haber tenido en nuestra alma colectiva. Por vez primera en su historia nuestro pueblo tuvo ante sí las tres alternativas generadas hace un siglo e hizo una decisión. Sabe ya que puede hacer otra distinta en otros plebiscitos, en cualquier momento que desee, y lo que es más importante, sabe que las elecciones no son para eso." J.M. García Passalacqua, *La Alternativa Liberal*, 25 (1974).

[8] Preámbulo, Const. E.L.A.; Art. II, Sec. 2, Const. E.L.A ., L.P.R.A., Tomo 1.

[9] Los más férreos defensores de la democracia han reconocido la preeminencia de los partidos como vehículos que facilitan la organización y efectividad colectiva de los individuos. James Madison, el "Padre de la Constitución" de Estados Unidos y uno de los propulsores de la Carta de Derechos de la Constitución federal, defendió la existencia de los partidos políticos y expresó que sin ellos "necesariamente habría una alarma universal para la seguridad pública o la extinción absoluta de la libertad". *The Federalist Papers*, Núm. 51, pág. 320.

democracia moderna funciona mediante los partidos políticos". *Fuster v. Busó*, 102 D.P.R. 327, 347 (1974).([10])

Precisamente en *Fuster v. Busó*, supra, este Tribunal resolvió que no viola el derecho al voto el que se certifique electo a un candidato a la Cámara de Representantes por adición, que obtuvo sustancialmente menos votos que otro candidato, debido a que el candidato certificado había sido postulado por un partido que había retenido su franquicia electoral mientras que el candidato que había obtenido una cantidad mayor de votos había sido postulado por un partido que no quedó inscrito. Los partidos políticos

> ...han llegado a asumir un rol cada vez más extenso e impor-
> tante en el funcionamiento cotidiano de los Estados modernos
> [por lo que] existe una correlación entre el sistema de partidos
> y el ordenamiento constitucional. Serrano Geyls, *Derecho Cons-*
> *titucional de Estados Unidos y Puerto Rico* [San Juan, Ed. C.
> Abo. P.R., 1986, Vol. I,] pág. 582. El ciudadano raramente par-
> ticipa como individuo aislado y lo hace en cambio como miem-
> bro de complejas formaciones sociales. Desde el punto de vista
> sociológico los partidos se presentan como organizaciones es-
> pontáneas caracterizadas por una comunidad de concepciones o
> de intereses políticos. *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 616–617
> (1988).([11])

---

([10]) "En ausencia de una negociación política productiva o un proceso político definitorio no debemos dudar que los anexionistas continuarán intentando lograr la mayor vinculación política por la vía de la decisión judicial y otro tanto harán los defensores del Estado Libre Asociado. Permanece, sin embargo, inalterada nuestra conclusión de que estas 'no son cuestiones a dilucidarse por las cortes ... sobre bases puramente jurídicas'. *Su solución correponde a la acción de los partidos políticos y las ramas legislativas y ejecutivas.*" (Énfasis suplido.) N. Colón Martínez, *La asigna-*ción de funciones extrajudiciales al poder judicial, 43 (Núm. 4) Rev. C. Abo. P.R. 597, 599–600 (1982).

([11]) La opinión concurrente del Juez Rigau en *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49, 74 (1976), provee una útil sinopsis sobre la preeminencia de los partidos políticos como los vehículos por excelencia de la voluntad popular:

"La soberanía popular[, señala,] la tiene el electorado, la hace efectiva a través de los partidos políticos, éstos al llegar al poder forman gobierno. El gobierno siem-pre recordará que la voluntad del pueblo es la fuente del poder público y que de allí emana su poder. La elección lo que ha hecho es legitimar el ejercicio de ese poder. Puede verse por qué se considera fundamental la función de los partidos políticos en el sistema democrático moderno.

Lo anterior no quiere decir, desde luego, que el interés del partido es lo principal y que todo otro interés debe supeditarse a aquél. *Todo político y todo gobernante serio sabe que lo principal es el interés general del país, el bien común. Todos los demás*

Por los motivos expuestos, no resulta ofensiva a los derechos fundamentales de los apelantes la disposición de la Ley del Plebiscito de 1993 que confiere a los partidos políticos la respectiva defensa de las tres (3) fórmulas de *status*. Resultaría absurdo obligar a la Legislatura a escoger otro método cuando nuestra historia legislativa y la correspondiente doctrina jurisprudencial ha sancionado el método escogido.

## VI

A diferencia de la Ley del Plebiscito de 1967, la Ley del Plebiscito de 1993 no dispone que en la papeleta de votación se incluyan las definiciones de las fórmulas de Estadidad, Estado Libre Asociado e Independencia. Las llamadas "definiciones" de *status* para la consulta de 1993 no son sino aspiraciones propuestas por los tres (3) partidos políticos principales que representan las "tres corrientes ideológicas principales de nuestro desarrollo histórico".

Más aún, mientras que en la Ley del Plebiscito de 1967 la propia Asamblea Legislativa redactó lo que significaría un voto a favor de cada una de las tres (3) fórmulas de *status* y dispuso para la inclusión de tales "definiciones" en la papeleta de votación, la Ley del Plebiscito de 1993 dispuso en su Art. 1 que:

> Los respectivos partidos políticos principales o cualquier agrupación, organización o entidad certificada o seleccionada para defender una de las tres (3) fórmulas de *status*, redactarán la definición de la fórmula de *status* que promulguen y defienden [sic] durante el proceso plebiscitario que se autoriza en esta ley. 1993 Leyes de Puerto Rico 103.

---

*intereses tienen una posición inferior al bien común. Lo que lo anterior reconoce es la realidad histórica y práctica de que una democracia saludable funciona a través de los partidos políticos y no a través de votos fuera de partido, sin programa, sin líderes y sin rumbo.* No solo es esto una realidad histórica sino que es una cuestión fundamental pues el asunto va al corazón de la responsabilidad política, de la sustancia moral de todo gobierno. (Énfasis suplido.)

La citada disposición constituye un ejercicio razonable de la discreción del Poder Legislativo. A través de esta disposición se evita que una Asamblea Legislativa controlada por una mayoría parlamentaria pueda inclinar la balanza indebidamente a favor de una de las tres (3) opciones de *status* mediante la definición de dichas fórmulas.

Permitirle a cada elector escoger dentro de una misma fórmula aquella parte de la definición con que esté totalmente de acuerdo y rechazar dentro de esa misma fórmula aquella parte de la definición con que no simpatiza, frustaría el objetivo de la consulta que es recoger en la forma más adecuada posible el sentir del Pueblo en cuanto a su preferencia sobre unas fórmulas políticas que, aunque en sus detalles pudiesen contener varias alternativas, se fundan en unos principios abarcadores y fundamentales que han sido discutidos extensamente en Puerto Rico por largos años. Si cada elector pudiese emitir su voto de la manera en que pretenden los apelantes, ello provocaría una desenfrenada fragmentación del voto que impediría una mayoría no sólo en esta consulta, sino en cualquier consulta futura. Véanse, en general: *Munro v. Socialist Workers Party*, supra, pág. 196; *Storer v. Brown*, 415 U.S. 724 (1974); *The Federalist Papers*, Núm. 10, pág. 77.

Al aplicar el balance de intereses tenemos que reconocer que el Estado tiene interés legítimo en evitar una desenfrenada fragmentación (*Munro v. Socialist Workers Party*, supra; *Burdick v. Takushi*, supra); en eliminar la posibilidad de confusión por parte de los votantes limitando el número de opciones específicas ofrecidas en la papeleta (*Lubin v. Panish*, supra, pág. 708), y en garantizar mayorías o pluralidades sustanciales (*Bullock v. Carter*, 405 U.S. 134, 145 (1972)). Veáse, además, *Storer v. Brown*, supra.

Tales intereses del Estado propenden a alcanzar el objetivo cardinal del estatuto, el cual, como hemos señalado, es el de recoger el sentir del electorado puertorriqueño so-

bre su futuro político. Así lo reconoce en este mismo caso uno de los ilustres miembros de este Tribunal al señalar que "el propósito de pulsar las preferencias tradicionales [de *status*] es un interés apremiante" del Estado. Ver Opinión concurrente y disidente del Juez Asociado Señor Negrón García. A su vez, la Legislatura persigue establecer un proceso eleccionario mediante el cual se minimice la confusión de los votantes, lo que se logra al someterle al electorado papeletas que sean manejables y entendibles. Dichos objetivos son del más alto orden. *Bullock v. Carter*, supra, págs. 144–146; *Lubin v. Panish*, supra, pág. 715. Sostenemos que el Estado logra cumplir con su objetivo al permitirle al elector que se exprese sobre *una* de las tres (3) fórmulas, evitando de esa manera que éste se tenga que enfrentar a una posible infinidad de modalidades que intelectualmente se pudiesen concebir dentro de cada una de las opciones políticas sin que históricamente hayan sido sustentadas en forma palpable por sector alguno del Pueblo.

## VII

Por último, debemos enfatizar que las mal llamadas "definiciones" de las tres (3) opciones de *status* no equivalen a las fórmulas de *status* como tradicionalmente se conocen por los puertorriqueños. Un voto por cualquiera de las tres (3) fórmulas de *status* que aparece en la papeleta de la consulta de 14 de noviembre de 1993 no constituye necesariamente una afirmación de apoyo a cada uno de los aspectos elaborados por los partidos políticos en sus "definiciones". Estas "definiciones" de las fórmulas de *status* son más análogas a una promesa contenida en la plataforma de un partido, o a un propuesto mandato político, que a una definición jurídicamente precisa y taxativa. Por su propia naturaleza constituyen propuestas que, tras la

consulta, seguirán sujetas a la negociación política, a la influencia de grupos de interés y al consenso.[12]

El Imperio del Derecho no puede edificarse sobre terrenos baldíos y carentes de realidad. Es por ello que no podemos cerrar los ojos ante la realidad de que, a través de la campaña publicitaria realizada por los tres (3) partidos políticos y por la Comisión Estatal de Elecciones, esta distinción entre las "definiciones" propuestas y las tres (3) fórmulas de *status* no se estableció de forma clara ante el electorado. Por ello, a pesar de que el daño de los apelantes no es de tal magnitud que transgreda sus derechos fundamentales como electores, reconocemos que si ellos están en desacuerdo con la definición de aquella fórmula que alegadamente respaldan, a tal grado que su conciencia no les permite emitir su voto por esa fórmula, al menos dentro del contexto de esta consulta, entonces deben poder expresar ese rechazo de alguna forma ya que "una reglamentación electoral razonable no puede requerir que los votantes abracen una posición que ellos no respaldan". *Burdick v. Takushi*, supra, pág. 256.

Es por ello que estamos de acuerdo con el remedio que el Tribunal ha provisto. El mismo permite votar en blanco a todas aquellas personas que no quieran suscribir una de las fórmulas por estar en desacuerdo con las definiciones ofrecidas por los respectivos partidos políticos. Dicho remedio es de fácil implantación; no resulta oneroso ni en forma alguna contraviene el propósito expreso de la Legislatura al adoptar el estatuto en cuestión. A su vez, el remedio le provee un mecanismo para votar en contra de las tres (3) fórmulas a aquellos electores que no respaldan alguna de dichas fórmulas por tener una concepción distinta de las

---

[12] La abogada del apelante Colón Martínez, licenciada Celina Romany, reconoció en la vista oral celebrada ante este Tribunal el 3 de noviembre de 1993 que las "definiciones" redactadas por los partidos políticos son "diferentes manifestaciones" de las tres (3) fórmulas de *status* tradicionales.

mismas. Dicho remedio constituye, pues, un balance armonioso de todos los intereses implicados en este caso.

Al descargar nuestra función revisora, no hicimos sino seguir el principio de que "[c]uando un estatuto resulta defectuoso por exclusión existen dos vías remediales: declarar su nulidad y negar sus beneficios a toda la clase beneficiada legislativamente, o extenderlos para incluir a los perjudicados con la exclusión". *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 641–642 (1984), opinión del Juez Asociado Señor Negrón García.

Más aun, no debemos obviar el hecho de que para justificar la declaración de inconstitucionalidad de esta ley no "es suficiente recurrir a un slogan poco coherente, como 'partidocracia'... Resulta difícil imaginar cómo la revisión judicial podría subsistir si las adjudicaciones constitucionales se basan en la noción personal -e igualmente idiosincrática—de los jueces sobre si una medida legislativa responde a intereses 'partidistas' o de 'sana política pública' ".[13] ¿No resulta, acaso, más cónsono con la genuina democracia una ley que provee para la definición de las tres (3) fórmulas de status por los tres (3) partidos políticos que tradicionalmente las han representado y defendido, que un estatuto que pone en manos de la mayoría parlamentaria la redacción de las definiciones de tales fórmulas?[14]

Una cosa es la determinación de la *constitucionalidad* de una medida legislativa y otra muy distinta es la *sabiduría o conveniencia política* de determinada ley. La pri-

---

[13] J.J. Álvarez González, *Derecho Constitucional, en Análisis del Término 1990–1991 del Tribunal Supremo de Puerto Rico*, 61 (Núm. 4) Rev. Jur. U.P.R. 637, 786 n.770 (1992).

[14] Los apelantes Sánchez Vilella y Colón Martínez señalan, *inter alia*, en su alegato de apelación ante este Tribunal, que

"[l]a deficiencia de la Ley no estriba en que el estado someta las tres fórmulas al voto de los electores, sino en la complicidad del Estado y los partidos políticos al conceder la Legislatura un monopolio y subvencionar la delegación a los partidos políticos de la definición y contenido de dichas fórmulas." Escrito y alegato de apelación, pág. 19.

mera es provincia exclusiva de la rama judicial;([15]) ésta última compete a las ramas políticas.([16])

En resumen, ante los hechos particulares del caso de autos y a la luz de los principios de hermenéutica descritos, entendemos que se provee un remedio que salva la laguna estatutaria en cuanto a aquellos electores que no estén de acuerdo con las definiciones partidistas sometidas en virtud de la legislación de marras.([17])

*Por los fundamentos antes expuestos, estamos conformes con la Opinión Per Curiam del Tribunal y con las resoluciones que deniegan las mociones de reconsideración de los apelantes.*

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

Estamos conformes con la Opinión del Tribunal y con las resoluciones que deniegan las mociones de reconsideración de los apelantes. En particular, estamos de acuerdo con el remedio diseñado para proteger el derecho al voto de aquellos electores que no favorecen ninguna de las tres (3)

---

([15]) Bajo el sistema democrático de gobierno que rige en Puerto Rico, la autoridad para interpretar la Constitución y las leyes del país reside exclusivamente en la Rama Judicial ... La Rama Judicial puede resolver que determinada facultad le corresponde tan solo a otra Rama, pero la interpretación al efecto es atributo exclusivo de los tribunales. *Santa Aponte v. Ferré Aguayo*, 105 D.P.R. 670, 671 (1977).

([16]) La determinación inicial que tomen los poderes públicos —Legislativo y Ejecutivo— sobre lo que es un fin público es revisable por el Poder Judicial. Sin embargo, en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos: *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 611 (1988).

([17]) Tomamos conocimiento judicial de que la Comisión Estatal de Elecciones ha cumplido con nuestra Sentencia de 4 de noviembre de 1993 al difundir el mensaje de que si los electores no están de acuerdo con las definiciones de las fórmulas de *status* propuestas por los partidos políticos podrán depositar su papeleta en blanco en la consulta de 14 de noviembre de 1993.

fórmulas de *status* o las definiciones de las mismas que han presentado ante la Comisión Estatal de Elecciones los partidos políticos principales. A nuestro juicio, este remedio es compatible con la reglamentación electoral vigente y permite proteger adecuadamente el derecho al voto de los apelantes sin necesidad de medidas adicionales que requieran la posposición de un evento de tanta trascendencia pública como es el Plebiscito sobre el *Status* Político de Puerto Rico de 14 de noviembre de 1993.

## I

Mediante la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 101–103, la Asamblea Legislativa autorizó la celebración de un plebiscito para que los electores puedan escoger entre tres (3) fórmulas de *status*: Estadidad, Estado Libre Asociado e Independencia. Con el fin de evitar los escollos que confrontó el plebiscito de 1967, la Asamblea Legislativa decidió delegar a los partidos políticos principales la definición y defensa de la fórmula por la que tradicionalmente cada uno ha abogado. Los tres (3) partidos aceptaron la delegación y presentaron sus respectivas definiciones ante la Comisión Estatal de Elecciones (C.E.E.).

En cumplimiento del mandato legislativo, la C.E.E. ha realizado una extensa campaña para informar al electorado de estas definiciones. Aunque las mismas no aparecerán impresas en la papeleta electoral, la ley ordena su impresión en una hoja separada que será entregada a cada elector junto con la papeleta. El caso de autos surge a raíz de la inconformidad de los apelantes con dos (2) de estas definiciones.

Los señores Roberto Sánchez Vilella y Noel Colón Martínez son electores debidamente inscritos quienes no están afiliados a ninguno de los partidos políticos. El señor Sánchez Vilella favorece la libre asociación, pero no está de

acuerdo con la definición del Estado Libre Asociado formulada por el Partido Popular Democrático (P.P.D.). El señor Colón Martínez, por su parte, favorece la Independencia, pero no concurre con la definición que presentó el Partido Independentista Puertorriqueño (P.I.P.).

Ambos sostienen que a pesar de que las definiciones no aparecerán en la papeleta, el proceso que provee la Ley Núm. 22, *supra*, es tal que las mismas están inextricablemente ligadas a las fórmulas que sí aparecerán y que la referida ley es inconstitucional, toda vez que no les permite votar por una definición diferente de las fórmulas que ellos favorecen.

Aducen que este impedimento opera de dos (2) formas distintas. La primera es la ausencia de una cuarta columna en la papeleta para que ellos puedan escribir la definición de su preferencia o al menos manifestar su oposición a las definiciones de los partidos; la segunda es la falta de un procedimiento para que ellos puedan inscribir partidos u otras agrupaciones políticas con facultad en ley para colocar alternativas distintas en la papeleta. A manera de remedio, solicitan que se decrete la inconstitucionalidad de la Ley Núm. 22, *supra*, y que se emita un interdicto permanente contra la ejecución de la misma.

Los demandados opusieron varias defensas que no versan sobre los méritos del caso, a saber: falta de legitimación activa, incuria en la presentación de la demanda, falta de parte indispensable y la presencia de una cuestión política. En cuanto a los méritos, todos coinciden en que los apelantes no están impedidos de votar por la fórmula de *status* de su preferencia, toda vez que la papeleta sólo contiene las fórmulas y no las definiciones sometidas por los partidos.

A su entender, el plebiscito gira en torno a las fórmulas y no a sus definiciones, razón por la cual sostienen que no hay impedimento alguno para que los señores Sánchez Vilella y Colón Martínez voten por el Estado Libre Asociado y

la Independencia, respectivamente. Ellos sostienen que las definiciones no están inextricablemente ligadas con las fórmulas que aparecerán en la papeleta y que son unas meras guías educativas de escaso valor jurídico.

El Tribunal Superior, Sala de San Juan, desestimó la demanda luego de concluir que los apelantes carecían de legitimación activa para promover las acciones pretendidas. A su entender, el apoyo público de los apelantes a la alternativa de la abstención demostraba que ninguno de ellos tenía un interés legítimo en proseguir vigorosamente con sus acciones y traer a la atención del tribunal todas las cuestiones en controversia. Descartó el fundamento estatutario de legitimación del Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051, con el mero señalamiento de que la misma no era compatible con la Ley Núm. 22, *supra*. Amparado en estas conclusiones, estimó improcedente dilucidar las demás defensas preliminares así como los méritos del caso.

Aceptamos las peticiones de los señores Sánchez Vilella y Colón Martínez como apelaciones civiles y revocamos la sentencia apelada.

## II

Pasamos a atender las defensas que no versan sobre los méritos del caso. Comenzamos por la defensa de falta de legitimación activa.

La Ley Núm. 22, *supra*, es una ley especial ubicada dentro del marco legal de la Ley Electoral de Puerto Rico. El Art. 2.001, *supra*, de esta última establece una Carta de Derechos y Prerrogativas de los Electores y le concede a cada elector la capacidad para promover cualquier acción legal "al amparo" de la misma. La premisa inarticulada de esta disposición es que el elector que acude ante el tribunal se debe encontrar *adversamente afectado* por una actua-

ción gubernamental que menoscabe los derechos y prerrogativas otorgados en dicha carta.([1])

Los apelantes sostienen que la Ley Núm. 22, *supra*, les priva de dos (2) derechos reconocidos en la referida Carta de Derechos y Prerrogativas de los Electores: (1) el derecho al voto universal, igual, libre, directo y secreto, y (2) el derecho a participar en la inscripción de partidos, ambos derechos de estirpe constitucional en las Secs. 2 y 6 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

En cuanto al reclamo del derecho al voto, no nos cabe duda de que el Art. 2.001 de la Ley Electoral de Puerto Rico, *supra*, le concede legitimación activa a los apelantes. La alegación principal de éstos es precisamente que la citada Ley Núm. 22 les priva de su derecho al voto universal e igual, toda vez que les impide votar por su propia definición de la fórmula de *status* que ellos favorecen o por lo menos manifestar su oposición a las definiciones sometidas por los partidos.

No podemos llegar a la misma conclusión, sin embargo, con respecto al reclamo de los apelantes de que la Ley Núm. 22, *supra*, les privó de su derecho a inscribir un partido político y colocar una alternativa distinta en la papeleta. Lo cierto es que ni el señor Sánchez Vilella ni el señor Colón Martínez han demandado en representación de terceros, mucho menos en representación de un partido político o agrupación similar. Así lo reconocieron en la vista oral celebrada por esta Curia. No es posible decir, por lo tanto, que se ven adversamente afectados por la decisión

---

([1]) El Art. 6 de la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 104–105, provee que las disposiciones de la Ley Electoral de Puerto Rico serán de aplicación supletoria, salvo que sean incompatibles con la propia Ley Núm. 22. En ausencia de una clara indicación legislativa de que la Carta de Derechos y Prerrogativas de los Electores de dicha ley electoral es incompatible con la Ley Núm. 22, *supra*, nos vemos impedidos de así concluir. Después de todo, esta carta es el instrumento principal que nuestra ley orgánica en materia electoral le concede a los electores para poder vindicar sus derechos.

de la Asamblea Legislativa de limitar la participación en el plebiscito a los tres (3) partidos políticos actualmente inscritos. En vista de esta conclusión, entendemos que es innecesario determinar si los apelantes cumplen o no con los criterios de la doctrina constitucional de legitimación activa. Véase *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992).

Pasamos ahora a la defensa de incuria. Para que esta defensa prospere es preciso que la conducta negligente en la presentación del recurso sea una que cause una demora innecesaria e indebida que de hecho perjudique a los demás intereses privados o públicos implicados. *Rivera v. Depto. de Servicios Sociales*, 132 D.P.R. 240 (1992); *Pueblo v. Tribl. Superior*, 81 D.P.R. 904 (1960).

Al evaluar la procedencia de esta defensa, no podemos perder de vista la celeridad del trámite implicado en la Ley Núm. 22, *supra*, ya que desde su aprobación hasta la celebración del plebiscito transcurriría un corto período de poco más de cuatro (4) meses. Los apelantes presentaron su demanda el mismo día en que la C.E.E. convocó oficialmente al plebiscito. Dicha convocatoria se emitió alrededor de un mes y medio después de que los tres (3) partidos políticos presentaran sus definiciones de las fórmulas ante la C.E.E. y casi dos (2) meses antes de la celebración del plebiscito. Ante estas circunstancias, no podemos concluir que los apelantes no actuaron con la diligencia requerida. Sería injusto invocar la doctrina de incuria para privarles de su día en el tribunal.

Tampoco consideramos meritorio el planteamiento sobre la ausencia de los partidos políticos principales como partes indispensables. La inclusión de los partidos como partes en esta contienda no es necesaria para que el Tribunal pueda dictar un remedio completo, toda vez que los reclamos de los apelantes van dirigidos contra la entidad gubernamental que tiene la encomienda de poner la Ley Núm. 22, *supra*, en vigor, esto es, la C.E.E. Regla 16 de

Procedimiento Civil, 32 L.P.R.A. Ap. III. Además, por virtud de la Ley Electoral de Puerto Rico, los partidos están oficialmente representados en la C.E.E. por los Comisionados Electorales, y éstos fueron debidamente incluidos como partes en el presente caso. 16 L.P.R.A. sec. 3003(11).

Por último, entendemos que este caso no presenta una cuestión política no justiciable. *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986). Los apelantes sostienen que la Ley Núm. 22, *supra*, les priva de su derecho al voto universal, libre e igual y de su derecho a la libre asociación, ambos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico. Ante estos reclamos no podemos olvidar que este Tribunal, como último intérprete de los contornos de nuestra Constitución, tiene la encomienda de velar porque los actos de una u otra de las ramas del Gobierno no excedan su autoridad constitucional. *Silva v. Hernández Agosto*, supra, págs. 54 y 55. El hecho de que esta contienda judicial esté revestida de un gran interés político no es óbice para que abdiquemos nuestra responsabilidad de proteger los derechos que la Constitución le garantiza a nuestra ciudadanía.

## III

Aclarados estos extremos, atendemos el reclamo de los apelantes de que la Ley Núm. 22, *supra*, viola su derecho al voto igual al impedirles votar por su propia definición de las fórmulas de *status* que favorecen o, por lo menos, votar en oposición a las definiciones de los partidos.

Los señores Sánchez Vilella y Colón Martínez favorecen dos (2) de las fórmulas de *status* que aparecen en la papeleta del plebiscito, pero no están de acuerdo con las definiciones de las mismas presentadas por los partidos políticos a los que la Ley Núm. 22, *supra*, delegó esta encomienda. Sostienen que estas definiciones están tan inextricablemente ligadas con las fórmulas contenidas en la papeleta,

que un voto por estas fórmulas inevitablemente representaría un voto por las definiciones de los partidos. Votar por las definiciones es precisamente lo que ellos no quieren hacer. Argumentan, por lo tanto, que la ausencia de una cuarta columna en la papeleta para escribir su propia alternativa o manifestar su oposición a las definiciones de los partidos les priva de su derecho constitucional a emitir un voto eficaz conforme a los dictados de su conciencia.

Por su parte, los demandados sostienen que las definiciones de los partidos son separables de las fórmulas que aparecerán en la papeleta, y que un voto por una de ellas no es necesariamente un voto por la definición del partido que la defiende. Según este argumento, las definiciones no son más que unas guías para orientar a los electores sobre la posición de cada partido sobre la fórmula en cuestión. Nos invitan a concluir, por lo tanto, que a los señores Sánchez Vilella y Colón Martínez no se les ha privado de su derecho al voto, toda vez que ellos no están impedidos de votar por la fórmula que cada uno favorece.

No podemos suscribir esta posición. Si una cosa se desprende con claridad de la Ley Núm. 22, *supra*, es el importante papel que juegan las definiciones de las fórmulas en el proceso establecido para regir este evento electoral. Si bien las definiciones no aparecerán en la papeleta, podemos tomar conocimiento judicial de que las mismas han sido objeto de una campaña masiva de difusión pública por parte de la C.E.E. y de los partidos políticos. Tal es la relación entre las fórmulas y las definiciones que la Ley Núm. 22, *supra*, ordena que el día del plebiscito éstas sean entregadas a cada elector junto con la papeleta al momento de la votación. En estas circunstancias no es irrazonable pensar que un elector pueda concluir que un voto por las fórmulas representa también un voto por las definiciones. Procede, por lo tanto, analizar el reclamo de los apelantes de que la Ley Núm. 22, *supra*, les ha violado su derecho a emitir un voto eficaz.

## IV

Sabido es que el Art. II, Sec. 2 de la Constitución del Estado Libre Asociado dispone que:

Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. L.P.R.A., Tomo 1, ed.1982, pág. 261.

*Esta disposición no sólo requiere que el Estado se abstenga de interferir con el derecho al voto universal, libre, igual, directo y secreto, sino también le impone la importantísima obligación de tomar medidas afirmativas para salvaguardar este derecho.*

En su esencia, el derecho al voto es el derecho de cada ciudadano a emitir un voto eficaz de acuerdo con los dictados de su conciencia. 16 L.P.R.A. sec. 3002. Poco valor tendría este derecho si el Estado, a su vez, no tuviera la obligación de garantizar la eficacia del mismo contando y adjudicando cada voto de la manera que el elector lo ha emitido, bien sea en elecciones generales como en los referéndum o los plebiscitos. "El elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto rigor en una multiplicidad de situaciones. Amplia jurisprudencia así lo reconoce, tanto en Puerto Rico como en Estados Unidos." *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 615 (1988).

Este derecho, sin embargo, puede estar sujeto a ciertas limitaciones, precisamente para garantizar su propia eficacia. Anteriormente hemos reconocido que toda reglamentación que, sin obstaculizar innecesariamente el derecho al voto, propenda a la realización de un proceso electoral justo, ordenado y libre de fraude constituye un interés lícito y apremiante del Estado. *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 405 y 406 (1980). El Art. VI, Sec. 4. de nuestra Constitución, L.P.R.A., Tomo 1, le concede a la Asamblea Legislativa amplia potestad para deter-

minar y reglamentar todo lo concerniente al proceso electoral. *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 749 y 750 (1976).

Ahora bien, "[n]i la potestad legislativa de reglamentar como tampoco el derecho al sufragio pueden operar bajo un esquema de disposiciones legislativas arbitrarias o en irrestringidos reclamos de electores; no son valores que se implementan en términos absolutos". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 406. Corresponde a los tribunales la delicada tarea de hacer su parte como celoso guardián para asegurar que la legislación aprobada por la Asamblea Legislativa cumpla con el mandato del Art. II, Sec. 2 de nuestra Constitución, *supra. P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 221 (1981) . "Reconocemos en el derecho al voto uno de los derechos fundamentales del pueblo y, como tal, es nuestra obligación hacerlo observar y respetar." *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 221.

Por otro lado, nuestro ordenamiento constitucional asigna a los tribunales la ineludible obligación de velar por que toda reglamentación del proceso electoral cumpla a cabalidad con el principio rector que impregna la Carta de Derechos de la Constitución de que en una sociedad democrática todos los electores gozarán de igualdad de derechos. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 637 (1984). Como bien afirma la opinión del Tribunal,

[a]l descargar esta responsabilidad tenemos que hacer un delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar su ejercicio para que el proceso se conduzca ordenadamente con la mayor participación de electores en igualdad de condiciones. Véase, a modo ilustrativo, *Anderson v. Celebrezze*, 460 U.S. 780 (1983). *Cada decisión debe tomarse con cuidado, atendiendo a las circunstancias particulares de cada caso. Como principio general, aquella legislación que sea onerosa y afecte sustancialmente el derecho al sufragio es susceptible de impugnación constitucional.* (Énfasis en el original.) *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445, 449–450 (1993).

Conforme con estos principios, en *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 92 (1980), manifestamos que "[t]odo obstáculo al voto debe ser objeto de escrutinio judicial vigoroso, mas con la debida atención de dar el debido peso a los intereses apremiantes del Estado".

## V

En *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 609 (1978), reconocimos que la Asamblea Legislativa tiene la facultad para disponer plebiscitos no discriminatorios sobre la cuestión general del *status* político de Puerto Rico o sobre otras medidas que puedan afectar la relación de Puerto Rico con Estados Unidos.

Los apelantes sostienen que el plebiscito que autoriza la Ley Núm. 22, *supra*, es discriminatorio toda vez que les priva de una oportunidad de emitir un voto eficaz, ya sea a favor de una definición distinta de la fórmula de *status* que favorecen o en contra de las definiciones que han presentado los partidos políticos. Plantean que el Estado no ha demostrado tener ningún interés apremiante o de otra índole que justifique tal discriminación. A su entender, el Estado ha incumplido con la obligación que le impone la Carta de Derechos de nuestra Constitución de garantizar un proceso electoral justo y ordenado en el cual todos los electores puedan participar en igualdad de condiciones. *P.R.P. v. E.L.A.*, supra, pág. 637. Tienen razón.

En ninguna de sus comparecencias el Estado ha logrado demostrar que tiene un interés de suficiente importancia que justifique excluir de la votación a aquellos electores que, como los apelantes, no suscriben ninguna de las definiciones de los partidos políticos. De hecho, la Comisión Conjunta del Senado y la Cámara de Representantes sobre el Plebiscito de *Status* Político de Puerto Rico consideró una propuesta para incluir en la papeleta "una cuarta columna para que el pueblo expresara que no interesa el pro-

ceso plebiscitario". Informe de la Comisión Conjunta sobre el *Status* Político de Puerto Rico sobre el P. del S. 320 de 1ro de julio de 1993, pág. 25. Sobre este particular, la Comisión manifestó "que las personas que no favorezcan el proceso plebiscitario o las fórmulas que concursarán tienen la opción de hacer sentir su protesta absteniéndose de participar".

Obligar a la abstención, sin embargo, es una actuación legislativa que no tiene cabida en nuestro ordenamiento constitucional. La obligación del Estado de garantizar el derecho al voto requiere precisamente que se conceda a cada elector una oportunidad adecuada para emitir un voto que sea contado y adjudicado según emitido. Obligar a la abstención no es otra cosa, por lo tanto, que privar a los apelantes de su derecho fundamental al voto. Aquellos que no están de acuerdo con las definiciones de las fórmulas deben tener el mismo derecho que aquellos que están de acuerdo con emitir un voto que merezca todo el respeto del Estado.

Consideramos, por consiguiente, que como la Ley Núm. 22, *supra*, no provee un medio adecuado para que los apelantes puedan emitir un voto eficaz en la papeleta, bien sea a favor de las definiciones que ellos favorecen, o en contra de las presentadas por los partidos políticos principales, tenemos el deber de proveer un remedio.

## VI

De ordinario, cuando una ley resulta defectuosa por exclusión, este Tribunal tiene dos (2) remedios a su alcance, a saber: decretar la nulidad de la ley y negar sus beneficios a toda la clase legislativamente beneficiada, o extender los beneficios para incluir a los perjudicados por la exclusión. *P.R.P. v. E.L.A.*, supra, págs. 641 y 642. En *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618–619 (1981), hicimos con

respecto a esta segunda alternativa, los señalamientos siguientes:

En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por sub-inclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos. ... La regla es consustancial con el principio de que el Poder Judicial —en abono de una deferencia hacia el Poder Legislativo— debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su operación, a diferencia de éste, sin embargo, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la *extensión* de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen. (Énfasis en el original.) Véase, además, *P.R.P. v. E.L.A.*, supra, pág. 642.

Entendemos que éste es el curso de acción a seguir en este caso. Decretar la nulidad de la Ley Núm. 22, *supra*, sería un remedio extremo que no sólo frustraría el legítimo interés del Estado de celebrar un plebiscito sobre el *status* político de Puerto Rico, sino también afectaría el derecho al voto de todos aquellos electores que no tienen objeción a las fórmulas de *status* o las definiciones de las mismas. No vemos la necesidad de acudir a esta medida drástica cuando la Ley Electoral de Puerto Rico provee una alternativa que, a nuestro juicio, se presta fácilmente para salvaguardar el derecho al voto de los apelantes y así "superar las serias objeciones constitucionales planteadas" por éstos.

Por estas razones estamos conformes con el remedio que concede este Tribunal al ordenar "a la C.E.E. que el 14 de noviembre de 1993 adjudique las papeletas que se depositen en blanco como un voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos". (Énfasis en el original.) *Sánchez y Colón v. E.L.A. I*, supra, pág. 448.

A diferencia de la reimpresión de una nueva papeleta con una cuarta columna, ordenar la adjudicación del voto en blanco como un voto de oposición a las tres (3) alternativas no conllevaría la posposición del plebiscito. Tampoco requeriría trastocar la reglamentación electoral vigente. Nuestro ordenamiento electoral tradicionalmente ha permitido que los electores emitan su papeleta en blanco sin que nunca se hayan impugnado estas papeletas. De hecho, el Art. 6.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3261, y las Reglas 50(B) y (C) del Reglamento General para la Celebración del Plebiscito sobre *Status* Político de Puerto Rico del 14 de noviembre de 1993 y el Escrutinio General aprobado por la C.E.E. el 21 de julio de 1993, expresamente reconocen el voto en blanco como una de las formas de clasificar las papeletas.

El referido reglamento también establece un procedimiento específico para la adjudicación de papeletas en blanco que evita el fraude electoral. Dispone la Regla 50(C) del citado reglamento de la forma siguiente:

> Deberán examinar bien que las papeletas votadas en blanco no tengan marca válida alguna, y una vez verificado, procederán entonces a cruzarle una línea horizontal de un extremo a otro de la papeleta por debajo de las figuras geométricas para inutilizarlas. Sobre la faz de éstas se les escribirá: "VOTANDO EN BLANCO", debiendo ser firmada por todos los inspectores. La cantidad de éstas se anotará en el espacio correspondiente en el borrador en el "cuadre de colegio", y se colocarán aparte en el sobre correspondiente. Regla 50(C) del Reglamento General para la Celebración del Plebiscito sobre *Status* Político de Puerto Rico del 14 de noviembre de 1993 de 21 de julio de 1993, pág. 79.

Al diseñar este remedio, este Tribunal no puede presumir que los funcionarios electorales cometerían fraude al momento de adjudicar estas papeletas. *Esto sería dudar de la integridad de miles de ciudadanos que voluntariamente sirven al proceso electoral y contribuyen al fortalecimiento de la democracia puertorriqueña.*

Finalmente, estamos de acuerdo con el Tribunal de que

este remedio no sería totalmente eficaz si no ordenamos a la C.E.E. tomar las medidas necesarias para informar a los electores del derecho que tienen de entregar una papeleta en blanco como medio de expresar que no favorecen ninguna de las definiciones propuestas por los partidos políticos.

Por los fundamentos antes expuestos, estamos conformes con la Opinión del Tribunal y con las resoluciones que deniegan las mociones de reconsideración de los apelantes.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

(En Reconsideración)

I

Por *INCONSTITUCIONAL paralizaríamos* el denominado *Plebiscito sobre el Status Político de Puerto Rico,* (1) del próximo domingo 14 de noviembre.

Despejemos toda confusión fáctica y jurídica. La *velocidad* irrazonable inyectada por la Asamblea Legislativa a este evento, sin razón o motivo apremiante alguno, y el *esquema exclusivista-partidista* lo ha convertido en uno, de su faz *discriminatorio, asfixiante del derecho a la libre expresión, restrictivo de la libertad de asociación, y coactivo del derecho al voto.*

El remedio alterno mayoritario de adjudicar la papeleta en blanco como un voto de protesta o contra las definiciones de los partidos políticos es "trunco e incompleto", y no reivindica eficazmente los válidos y oportunos reclamos de los demandantes apelantes, los electores Roberto Sánchez Vilella y Noel Colón Martínez, y los electores miembros de

---

(1) Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 101–113.

la interventora apelante *Federación de Universitarios Pro–Independencia* (F.U.P.I.).

Nadie ha expuesto un solo argumento persuasivo contra la *innegable realidad de que "[e]ste Plebiscito ha transformado nuestra democracia en una partidocracia* integrada por el Partido Nuevo Progresista (P.N.P.), Partido Popular Democrático (P.P.D.) y por el Partido Independentista Puertorriqueño (P.I.P.)". *Sánchez y Colón v. E.L.A. I,* 134 D.P.R. 445, 452 (1993), opinión disidente y concurrente.

Reafirmamos la improcedencia de las defensas procesales del Estado, la Comisión Estatal de Elecciones (en adelante C.E.E.) y los Comisionados Electorales del P.N.P., P.P.D. y P.I.P., tendentes a evitar el examen sustantivo y a fondo de los méritos del pleito.

A. Es obvio que el ilustrado foro sentenciador erró al negarles legitimación activa y no permitir intervenir a la F.U.P.I. Si en Puerto Rico no existe el pleito de contribuyentes (*taxpayer suit*); si los legisladores de las minorías no pueden cuestionar las leyes; si una organización estudiantil *bona fide* como la F.U.P.I. ni otros electores cualificados pueden impugnar la Ley Núm. 22, *supra, ¿quién puede hacerlo? ¿Los partidos P.N.P., P.P.D. y P.I.P., únicos beneficiados ideológica y económicamente?*

La doctrina de legitimación activa es solamente *instrumental.* Responde a asegurar que el "promovente de la acción es uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversias". *Hernández Agosto v. Romero Barceló,* 112 D.P.R. 407, 413 (1982). Y en materia electoral, la balanza siempre la hemos inclinado hacia el elector. *Ortiz Angleró v. Barreto Pérez,* 110 D.P.R. 84 (1980); *P.S.P. v. E.L.A.,* 107 D.P.R. 590 (1978). *¿Qué mayor daño que perder el derecho a votar según los dictados de propia consciencia y libre albedrío? ¿Qué perjuicio más concreto que el Estado no cuente el voto?*

Realmente no existe problema alguno en cuanto al aspecto de la legitimación activa (*standing*) de los demandantes Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I. "El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el *elector individual.*" (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones,* 110 D.P.R. 400, 407 (1980). Como verdaderos destinatarios del sistema, el Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051, *in fine* expresa-

mente les concede como "electores la *capacidad para iniciar o promover cualesquiera acciones legales* al amparo de [la] *Declaración de Derechos y Prerrogativas de los Electores* ante el Tribunal de Primera Instancia que corresponda". (Énfasis suplido.) Aún así, el tribunal de instancia señaló: "En este caso la Ley Electoral es supletoria y ley general que no aplica en la medida en que sea incompatible con la ley especial." La dificultad de este razonamiento es que dicho foro no consignó en qué consistía la incompatibilidad; tampoco, los demandados nos lo han demostrado, menos la hemos detectado. *No existe ninguna incompatibilidad.*

B.  *El planteamiento de falta de parte indispensable es improcedente.* Ignora que además de la Comisión Estatal, también fueron demandados y emplazados *separadamente* los Comisionados Electorales del P.N.P., P.P.D. y P.I.P., quienes por ley ostentan oficialmente la representación de esos partidos.

Precisamente se trata de una *investidura legal doble*: una como miembros de la Comisión Estatal de Elecciones encargada de administrar la ley electoral y demás eventos comiciales, tales como la Ley Núm. 22, *supra*, y, otra, para representar y defender los intereses particulares de sus respectivos partidos políticos. 16 L.P.R.A. secs. 3004 y 3012. *La cuestión no amerita mayor elucidación.*

C.  Tampoco hay *incuria*. La *velocidad y cronología* con que se aprobó la Ley Núm. 22, *supra*, derrotan este planteamiento.

Se recordará que fue aprobada el domingo 4 de julio de este año. Concedió quince (15) días, esto es, hasta el *feriado* lunes 19, para que el P.N.P., P.P.D. y P.I.P. informaran a la Comisión Estatal su interés en participar defendiendo sus respectivas fórmulas de *status*. Art. 9 de la Ley Núm. 22, *supra*. Además, concedió treinta (30) días para que cada uno sometiera a dicha comisión "la definición concisa y clara sobre las fórmulas de *status* político que ellos promulgan". Art. 3 de la Ley Núm. 22, *supra*. Y mediante sorteo, "no antes de quince (15) días y no más tarde de veinte (20) días después de [su] vigencia", Art. 3, *supra*, la Comisión Estatal de Elecciones adjudicaría los símbolos correspondientes a cada fórmula. *Completado ese trámite*, la Comisión anunciaría mediante proclama, en tres (3) periódicos de circulación general, la celebración del plebiscito "con no menos de sesenta (60) días de anticipación". Art. 4 de la Ley Núm. 22, *supra*. Tomamos conocimiento judicial de que la proclama fue el 15 de septiembre.

*Con vista a esta vertiginosa cronología estatutaria es absurdo e injusto aplicar incuria.* Lo menos que podemos reconocer a los demandantes Sánchez Vilella y Colón Martínez es que su causa de acción no quedó debidamente configurada hasta que se pu-

blicó la proclama, el 15 de septiembre, precisamente el día en que presentaron la demanda.

*Independientemente de lo expuesto, es imposible negar que al Poder Judicial le ha tomado sesenta (60) días, esto es, dos (2) meses, adjudicarles su caso.* No hay el más mínimo indicador objetivo de que de haberse presentado el pleito antes, el Poder Judicial lo hubiese podido hacer más rápido.

Para fines del argumento de incuria, mediante un enfoque de rigurosa matemática, asumamos que los demandantes Sánchez Vilella y Colón Martínez, concediéndoles como mínimo una (1) semana para preparar la demanda —desde el 20 de julio, fecha en que los partidos políticos terminaron el trámite de sus definiciones— diligentemente debieron presentarla el 27 de julio. Aún así, el resultado hubiese sido que los sesenta (60) días de mínima adjudicación judicial se hubiesen cumplido el sábado 25 de septiembre, restando sólo cuarenta y nueve (49) días para la Comisión Estatal de Elecciones implantar cualquier remedio.

Y como informó en la vista oral el Presidente de la Comisión, Lcdo. Juan R. Melecio, y su abogado, Lcdo. David Rivé, los trámites relacionados con la necesidad de pedir el papel especial para las papeletas a Estados Unidos, su impresión —"por lo menos cuarenta y cinco (45) días antes de la fecha en que haya de celebrarse el Plebiscito" (Regla 8 del Reglamento Oficial de las Elecciones Generales de 1988)— y la preparación de miles de paquetes,([1]) es una tarea compleja, de meses. Resulta evidente que en nada se hubiese alterado el posible remedio judicial. *La situación de impotencia constitucional que enfrentamos no se debe a la falta de diligencia de los electores Sánchez Vilella y Colón Martínez, sino a los términos perentorios y cortos de la propia Ley Núm. 22, supra.*

El argumento de que debieron fundar o inscribir un partido antes de la Ley Núm. 22, *supra*, es *totalmente inmeritorio*. Repetimos una vez más, las declaraciones de candidatos e ideas en los programas preelectorales de los partidos sólo constituyen política pública oficial cuando se traducen en legislación. "Nuevamente parece olvidado que la *'política pública y la intención legislativa se investigan en los trámites, debates, informes y finalmente en los textos culminantes de los estatutos'. Pueblo v. González Malavé,* 116 D.P.R. 578, 586 (1985)." (Énfasis en el original.) *C.E.S. v. Gobernador I,* 134 D.P.R. 350, 359 (1993), opinión disidente.

Ciertamente, no tenían ningún deber de acudir a la Asamblea Legislativa. *¿Desde cuándo los ciudadanos tienen que comparecer a la casa de las leyes como requisito previo para luego impugnar la constitucionalidad de una ley?*

Además, imponerles como alternativa el conformarse con actuar sólo como observadores en el Plebiscito es insuficiente y no supera la inconstitucionalidad. *No es lo mismo ser observador que actor.*

El argumento de incuria pasa por alto que desde principios de enero de este año, en que comenzó la sesión ordinaria de la Asamblea Legislativa hasta la aprobación de la Ley Núm. 22, *supra*, el 4 de julio, transcurrieron seis (6) meses. En contraste, desde el 4 de julio hasta el 14 de noviembre sólo habrán transcurrido cuatro (4) meses y tres (3) semanas. *Aprisionado así por voluntad legislativa, es obvio que el factor tiempo incidió y anuló cualquier potencial de crear partidos por petición o agrupaciones con definiciones y criterios distintos a los del P.N.P., P.P.D. y P.I.P.*

*No se nos ha señalado una sola razón válida para esta prisa.* En la *Exposición de Motivos* se dice que "[a]l celebrar este año el Quinto Centenario del descubrimiento de nuestra Isla por España, *pesa enormemente en la conciencia* de los puertorriqueños el que tan importante fecha transcurra sin que puedan expresarse en cuanto a su porvenir". Exposición de Motivos de la Ley Núm. 22, *supra*, 1993 Leyes de Puerto Rico 101. Esta retórica expresión no es fundamento suficiente ni justifica la premura. La cuestión, aunque de gran interés público, no revestía carácter de urgencia ni justificaba sofocar la creación de otros partidos o agrupaciones en desacuerdo con su celebración o las definiciones propuestas. *No hay ninguna conexión lógica con el Quinto Centenario del descubrimiento de la Isla —19 de noviembre de 1993— y la celebración festinada del plebiscito cinco (5) días antes. Si hemos aguardado quinientos (500) años, ¿por qué no podemos esperar cinco (5) meses más y reconocer esos derechos? ¿Es que los electores disidentes o desafiliados de los partidos políticos principales no tienen derechos? Como jurista puertorriqueño, rehusamos añadir a nuestra conciencia el peso de semejante arbitrariedad y atropello.*

D. Por último, los reclamos de los electores Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I. son justiciables. La situación ante nos dista mucho de presentarse como *tabú* o *cuestión política.* La controversia real es una *pura de derecho*: interpretar si es constitucionalmente válida la Ley Núm. 22, *supra. Ello es función judicial por excelencia.*

Acoger la tesis del Estado, de la Comisión Estatal de Elecciones y de los demás demandados *representaría obliterar el sistema de separación de poderes.* Convertiría a la Asamblea Legislativa y al Ejecutivo en jueces absolutos de sus propios actos. " '¡No corresponde ocuparse, naturalmente, *de aquellos otros que, impresionados por la vibración, diré sonora, de las pala-*

bras *"cuestiones políticas"*, no penetran el concepto de la "justiciabilidad" y piensan, nada menos, que se pretende "politizar a la justicia" cuando lo que se quiere es *"despolitizar* a las soluciones jurídicas"...!' " (Énfasis suplido.) L.M. Boffi Boggero, *La función judicial y la abogacía*, 115 Rev. Jur. Arg. La Ley 1095, 1104 (1964).

———————

([1]) El Comisionado Electoral del Partido Nuevo Progresista (en adelante P.N.P.), licenciado Canals, aclaró que la Comisión Estatal estaba obligada a tener preparados los paquetes electorales a más tardar, como fecha límite legal, el 10 de noviembre. (Énfasis suplido.) *Sánchez y Colón v. E.L.A. I*, supra, págs. 454–459.

## II

En lo sustantivo, como analizáramos *in extenso* en esa ponencia, la Ley Núm. 22, *supra*, del Plebiscito concedió un *monopolio absoluto* a los tres (3) partidos principales; *oficializó y congeló* las definiciones y los significados de las fórmulas tradicionales de *status; negó* toda posibilidad de que los electores desafiliados pudieran organizar e inscribir un partido por petición; privó el *financiamiento* de fondos públicos a agrupaciones contrarias, y descartó *proveer una cuarta columna de designación directa* para cualquier otro elector hacer constar *su propia definición o protesta.*

Parece olvidado que nuestra Constitución protege no sólo a los electores que militan en el P.N.P., P.P.D. y P.I.P., sino a todos; y que a fin de cuentas, "[e]l derecho al sufragio, espina dorsal del cuerpo de la democracia, opera y se fortalece de aires y corrientes liberales". *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 423 (1980).

Como resultado de todas estas arbitrariedades, en su contexto histórico y ámbito electoral funcional definitorio, este Plebiscito *"[e]n sus entrañas lleva el vicio del engaño y desde su génesis está herido de muerte. Repetimos, toda consulta electoral es en sí un pacto de la más alta categoría en el orden jurídico y social del derecho público. ... No deberíamos judicialmente refrendar un plebiscito que niega*

*acceso a las urnas a sectores y a voces importantes del país,
que desvirtúa el propósito de su celebración e inmola la
verdadera esencia del voto libre como instrumento de utili-
dad en una sociedad democrática".* (Énfasis en el original.)
*Sánchez y Colón v. E.L.A. I*, supra, págs. 475-476.

Finalmente, para quienes no entienden la sicodinámica
que ha inspirado nuestro decreto de inconstitucionalidad y
paralización desde nuestra primera ponencia, recomenda-
mos una lectura más serena y reflexiva al efecto.

— O —

Opinión disidente emitida por el Juez Asociado Señor Re-
bollo López.

Por primera vez en la historia de Puerto Rico —dentro
del contexto del proceso político y por instrucciones de este
Tribunal— *se le da valor y significado a un acto estéril e
inconsecuente como lo es el depósito de una papeleta en
blanco en las urnas de votación.* Esto es, el "votar por
nada"; ello en vista del hecho de que nunca se podrá cono-
cer cuál fue el propósito y la motivación del elector que así
actuó.

Dicha acción, a nuestra manera de ver las cosas, *consti-
tuye un increíble paso de retroceso después de décadas de
madurez y progreso político.* La misma es contraria a la
tradición electoral imperante en todo país que aspire a ser
reconocido como uno democrático *donde, necesariamente, el
voto que emite un ciudadano en un proceso eleccionario
siempre ha tenido un significado positivo y el propósito de
ser ilustrativo e indicativo de las inquietudes y preferencias
de cada elector*; ello con el objetivo de que los funcionarios
que dirigen los destinos del Gobierno puedan diseñar, y
poner en vigor, los planes necesarios para alcanzar las me-
tas que la mayoría de los ciudadanos de ese país entienden
convenientes para el bienestar colectivo del mismo.

*La decisión mayoritaria emitida en el presente caso es*

*una, ciertamente, desafortunada.* La mayoría de los integrantes de este Tribunal aparentemente se han olvidado de que el poder judicial *no* es ilimitado *ni* irrestricto, *como tampoco* puede ser ejercitado en forma arbitraria. Esto es, la Mayoría se olvida del hecho de que la facultad constitucional que le concede la Constitución de Puerto Rico a este Tribunal siempre debe ser ejercitada dentro de los claros parámetros y guías que establece dicha Constitución *y, sobre todo, respetando los poderes y prerrogativas de las otras dos (2) Ramas del Gobierno de Puerto Rico.* En otras palabras, la decisión mayoritaria emitida en el caso del epígrafe no es, meramente, errónea en derecho. Hay más. La misma constituye una clara e indebida invasión de las facultades y prerrogativas que le concede la Constitución a la Asamblea Legislativa de Puerto Rico.

Ahora bien, lo verdaderamente penoso de toda esta situación radica en el hecho de que *la referida intromisión se da en el contexto de una acción fatalmente defectuosa.* En primer lugar, se trata de un caso que claramente adolece del *defecto de parte indispensable*, en relación con el cual el foro judicial se ve *imposibilitado* de proveer el remedio correctivo ordinario, establecido por la jurisprudencia, para esta clase de situaciones, a saber: ordenarle a la parte actora que corrija su omisión e incluya, y emplace, a la parte indispensable que por error dejó fuera del pleito; remedio correctivo que estamos imposibilitados de conceder debido al segundo defecto, o error, en que incurrió en el caso de autos la parte demandante y su representación legal, *el de incuria.*

Por otro lado, la decisión emitida por el Tribunal en el presente caso *claramente infringe el "principio de justiciabilidad"* por cuanto, como explicaremos más adelante, lo que plantea el presente caso es una *"cuestión política"*, en relación con la cual los demandantes Colón Martínez y Sánchez Vilella *carecen de "legitimación activa"* para radi-

car la acción que origina el recurso ante nuestra consideración.

Por último, y por las razones que expresáramos en el voto disidente preliminar el pasado 4 de noviembre de 1993, el "remedio" concedido por el Tribunal —*sin que este Foro tan siquiera haya decretado expresamente la inconstitucionalidad de la ley en controversia*— es uno improcedente y erróneo en derecho. En síntesis, y dicho con respeto, la actuación del Tribunal al así decidir trasciende los linderos del mero error para convertirse en una pesadilla y un absurdo. *Veamos.*

I

Los hechos

El 4 de julio de 1993 el Gobernador de Puerto Rico, Honorable Pedro J. Rosselló González, firmó la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 101–103, conocida como la Ley del Plebiscito de 1993 (en adelante Ley del Plebiscito). La referida Ley dispone para la celebración, el día 14 de noviembre del año en curso, de un Plebiscito, "en el cual el Pueblo de Puerto Rico se exprese sobre el *status* político de su preferencia". Art. 2, Ley Núm. 22 de 1993, Leyes de Puerto Rico 103. El 15 de septiembre del mismo año, *más de dos (2) meses después de haber sido aprobada la Ley Núm. 22, ante, y escasamente a dos (2) meses plazo del anunciado plebiscito,* los ciudadanos Roberto Sánchez Vilella y Noel Colón Martínez radicaron ante el Tribunal Superior, Sala de San Juan, el recurso que hoy nos ocupa y en el cual solicitan que se decrete la invalidez de la citada Ley Núm. 22.([1])

---

([1]) En la demanda de interdicto preliminar y permanente alegan que los Arts. 1, 9 y 18 de la Ley del Plebiscito de 1993, Leyes de Puerto Rico 103, 106–107 y 110 (en adelante Ley del Plebiscito), son inconstitucionales por violar sus derechos fundamentales al voto; a crear y desarrollar nuevos partidos políticos; a la igual protección

El mismo día 15 de septiembre, el Tribunal Superior dictó "Orden" a las partes para que comparecieran a una vista no evidenciaria el 21 de septiembre.(²) El 20 de septiembre, el Senador por el Partido Popular Democrático Eudaldo Báez Galib y la Juventud Autonomista de Puerto Rico presentaron solicitudes para comparecer como "amigos de la corte".(³) Por otro lado, el día de la vista, un grupo de seis (6) cubanos naturalizados ciudadanos de los Estados Unidos de América presentaron en corte abierta su solicitud para intervenir como amigos de la corte. En esa misma ocasión, y también en corte abierta, la Federación de Universitarios Pro Independencia (F.U.P.I.) solicitó ser admitida en el pleito en calidad de parte interventora.(⁴)

---

de las leyes; a la libertad de asociación; a los establecidos por la Declaración de Derechos y Prerrogativas de los Electores de la Ley Electoral vigente; y por violar el Art. II, Sec. 19 (reserva de derechos del Pueblo de Puerto Rico a participar en procesos electorales dirigidos a alterar las relaciones políticas con los Estados Unidos) y el Art. VI, Sec. 9 (uso de fondos públicos para fines públicos) de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.

(²) En dicha vista, cada parte argumentó sus planteamientos de derecho. Sin embargo, la parte demandante-apelante señala en su escrito de apelación ante este Tribunal, que dicha vista no fue señalada con el propósito de que las partes argumentaran sus respectivas posiciones de derecho, sino que fue durante la misma que, "sin haberse discutido las cuestiones de hecho que pudieran estar en controversia, el tribunal dispuso que cada parte argumentara sus planteamientos de derecho". Los demandantes-apelantes también señalan que, a pesar de la inquietud que al respecto manifestara al tribunal uno de sus abogados, en ningún momento durante la vista del 21 de septiembre se discutieron las cuestiones de hecho, sino que el tribunal manifestó que luego de leer los alegatos de las partes tomaría la determinación sobre la necesidad de recibir prueba en el caso.

Por su parte, la codemandada Comisión Estatal de Elecciones (C.E.E.) y su Presidente el Honorable Juan R. Melecio señalan en su Moción de Desestimación radicada ante este Tribunal, que la vista del 21 de septiembre fue celebrada en corte abierta, *y que al concluir la exposición de las partes el caso quedó sometido por los demandantes sin prueba alguna, y que dicha parte demandante no solicitó, en ningún momento posterior, la celebración de vista evidenciaria para presentar prueba que pudiese sustentar sus alegaciones.* Por lo tanto, la C.E.E. y su Señor Presidente alegan que no debe el Tribunal Supremo tomar como ciertos todos los hechos alegados en la demanda.

(³) Ninguno de los dos (2) compareció a la vista efectuada el día siguiente (21 de septiembre); sin embargo, sí presentaron memorandos de derecho en apoyo de sus respectivas posiciones.

(⁴) En su escrito de apelación, la parte interventora Federación de Universitarios Pro Independencia (F.U.P.I.), alega que durante la vista del 21 de septiembre, su representante legal argumentó al igual que las demás partes, y que el 27 de septiembre radicó Solicitud de Sentencia Sumaria y Memorando de Derecho juramentado y acompañado de prueba documental. Alega también que ninguna de las partes en el

Finalmente, el 23 de septiembre, tres (3) ciudadanos, en calidad de miembros no partidistas de la Comisión Especial de Información al Elector designada por la Comisión Estatal de Elecciones (C.E.E.), solicitaron entrada al pleito como parte interventora.

El 21 de octubre de 1993, luego de que todas las partes radicaran sus alegatos y las correspondientes réplicas, el Tribunal Superior dictó sentencia desestimando la demanda por carecer los demandantes de legitimación activa para incoar la misma.[5] En específico, el Tribunal Superior resolvió que los demandantes carecen de legitimación activa para impugnar la constitucionalidad de la Ley del Plebiscito porque ésta, alegadamente, no les brinda oportunidad, a ellos ni a otros electores "similarmente situados" pero no identificados, para la creación de partidos o agrupaciones políticas; ello en vista del hecho de que estos no han realizado gestión alguna conducente a la inscripción de un partido político por petición o para solicitar la participación como observadores en el plebiscito.[6] En segundo lugar, y en lo referente a la alegación de los demandantes de que la Ley del Plebiscito les priva de su derecho al voto, el tribunal sentenciador determinó que los demandantes carecían de legitimación activa para reclamar, para ellos o para terceros, el derecho a votar por otra opción de *status*,

---

pleito refutó sus planteamientos o presentó declaración jurada en su contra ni cuestionó su derecho a intervenir.

[5] En dicha sentencia, el tribunal también declaró sin lugar todas las solicitudes de comparecencia en calidad de amigo de la corte, así como las dos (2) solicitudes de intervención radicadas en el pleito. En síntesis, en cuanto a la solicitud de la F.U.P.I., el Tribunal Superior resolvió que la peticionaria estaba reclamando exactamente lo mismo que los demandantes y que por lo tanto, de ser correctos sus planteamientos, sus derechos no quedarían desprotegidos ni afectados, razón por la que, "en aras de evitar complicaciones y dilaciones en este pleito", denegó su petición de intervención.

[6] Según señala la sentencia del Tribunal Superior, algunos de los demandados presentaron una certificación emitida por el Secretario de la C.E.E. el 20 de septiembre del corriente, que demuestra que los demandantes no han realizado ninguna de estas gestiones, razón por la cual la reclamación que hacen es una abstracta y conceder legitimación activa para levantarla sería una actuación contraria a la norma establecida en *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980).

cuando ellos promulgan activa e intensamente la abstención electoral en este evento.(7)

Inconformes, tanto los demandantes Sánchez Vilella y Colón Martínez como la interventora F.U.P.I. recurrieron ante este Tribunal, mediante recurso de apelación, en el que alegaron la comisión de varios errores.(8) Ordenamos la celebración de una vista oral, la cual se llevó a cabo el

---

(7) Ello en vista de que ambos demandantes han organizado una agrupación denominada Coordinadora por la Cuarta Opción, la cual según se desprende de la Sentencia del Tribunal Superior, "dirigen y en la que inequívocamente han empeñado sus esfuerzos en convencer al pueblo puertorriqueño de que se abstenga de participar en el plebiscito de marras".

(8) Los demandantes Sánchez Vilella y Colón Martínez señalan que erró el Tribunal Superior:

"... al desestimar la acción instada por los demandantes-apelantes por falta de legitimación activa sin tomar en consideración que estos han sufrido un daño claro y palpable al amparo de la Constitución de los Estados Unidos y del Estado Libre Asociado de Puerto Rico.

"... al desestimar la demanda sin tomar como ciertos los hechos alegados por la parte demandante como procede conforme a las Reglas de Procedimiento Civil vigentes, violando además el debido proceso de ley.

"... al omitir totalmente resolver los reclamos de los demandantes-apelantes de violación a sus derechos constitucionales incluyendo su derecho al voto, a la libre asociación, a la libre expresión validando de paso la Ley del Plebiscito en violación de tales derechos.

"... al validar la Ley de Plebiscito, a pesar de que la misma viola la reserva de poderes de la Constitución del Estado Libre Asociado de Puerto Rico y la limitación del uso de fondos públicos para fines públicos." Escrito y alegato de apelación, pág. 8.

Por su parte, la F.U.P.I. le imputa al foro de instancia haber errado:

"...al resolver que los planteamientos de derecho, los daños sufridos y la capacidad para litigar de la interventora eran idénticos a los de los demandantes y al negarse a resolver un planteamiento por ser enrevesado, difícil y complejo.

"...al no resolver que la legislación impugnada es inconstitucional de su [f]az por discriminar contra la Federación y sus miembros electores no adscritos a los partidos políticos principales al crearse una clasificación *sospechosa* en abierto discrimen y perjuicio contra votantes hábiles y dispuestos para formar agrupaciones nacionales y locales por petición.

"...al no resolver que la [l]egislación [p]lebiscitaria impugnada es [i]nconstitucional al [i]nfringir claramente la Sección 6 del Artículo IX de la Constitución del Estado Libre Asociado de Puerto Rico.

"...al no resolver que la legislación plebiscitaria impugnada infringe los derechos a la libertad de expresión de la interventora apelante y sus integrantes.

"...al no resolver que el evento eleccionario pautado para el 14 de noviembre constituye además una interferencia de las Ramas Legislativa y Ejecutiva con la [r]eserva de [d]erechos garantizada en la Constitución del [E]stado Libre Asociado, Sección 19 del Artículo II de la Carta de Derechos al producir efectos sustanciales en asuntos del status político.

"...al no resolver que la [l]egislación [i]mpugnada es [i]nconstitucional por infringir el [d]erecho de la [i]nterventora como [o]rganización y sus [m]iembros a [p]edir la [r]eparación de agravios al Gobierno.

día 3 de noviembre de 1993. Una mayoría de los integrantes del Tribunal, mediante la emisión de una opinión *Per Curiam*, de fecha 4 de noviembre de 1993, *revocó* la sentencia emitida por el Tribunal Superior, ordenándole a la Comisión Estatal de Elecciones que adjudicara "[todas] las papeletas que se depositen en blanco como un voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos" conforme al procedimiento establecido por la Ley del Plebiscito. *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445, 450–451 (1993).

Dicha errónea, y sorprendente, determinación fue tomada por el Tribunal *sin* decretar expresamente la inconstitucionalidad de la referida Ley Núm. 22 y meramente "con el propósito de superar las serias objeciones constitucionales planteadas por los demandantes quienes no están de acuerdo con las definiciones partidistas sometidas en virtud de la Ley Núm. 22 ...".

Disentimos en aquella ocasión, mediante la emisión de un voto disidente preliminar, reservándonos el derecho a ampliar dicho disenso; ello conforme establece la Regla 4(b) del Reglamento de este Tribunal, 4 L.P.R.A. Ap. I–A. *Cumplimos hoy con dicho compromiso.*

## II

### Defecto de Parte Indispensable

En la demanda ante nuestra consideración, se incluyeron como demandados al Estado Libre Asociado, a la C.E.E., a su Presidente, y a los licenciados Carlos Canals, Ariel Nazario y Manuel Rodríguez Orellana, estos últimos en su carácter de Comisionados Electorales. *No obstante, los tres (3) partidos políticos* —Partido Nuevo Progresista, Partido Popular Democrático y Partido Independentista

---

"...al concluir que la interventora no tenía derecho a intervenir." (Énfasis en el original.) Escrito de apelación, págs. 8–9.

Puertorriqueño (en adelante P.N.P., P.P.D. y P.I.P., respectivamente)— *no fueron incluidos en la demanda radicada como demandados como tampoco, naturalmente, fueron emplazados con copia de dicha demanda.*

La Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, reconoce en nuestro ordenamiento *el mecanismo de la acumulación de parte indispensable.* La referida Regla establece:

> *16.1 Acumulación indispensable*
>
> Las personas que tuvieren un interés común *sin cuya presencia no pueda adjudicarse la controversia,* se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada. (Énfasis suplido.)

"Este precepto procesal se inspira en *dos (2) axiomas* que preordenan nuestro quehacer jurídico", a saber: *"El primero* es la protección constitucional que impide que persona alguna sea privada de la libertad y propiedad sin un debido proceso de ley. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; *Carrero Suárez v. Sánchez López,* 103 D.P.R. 77 (1974). *El segundo* es la necesidad de incluir a una parte indispensable para que el decreto judicial emitido sea completo." (Énfasis suplido.) *Cepeda Torres v. García Ortiz,* 132 D.P.R. 698, 704 (1993).

Este Foro ha *definido* parte indispensable como "aquella que tiene tal interés en la cuestión envuelta en la controversia que no puede dictarse un decreto final entre las partes en la acción sin lesionar y afectar radicalmente su interés, o sin permitir que la controversia quede en tal estado que su determinación final haya de ser inconsistente con la equidad y una conciencia limpia", o como "aquella persona cuyos derechos e intereses podrían quedar destruídos o inevitablemente afectados por una sentencia dictada estando esa persona ausente del litigio". *Fuentes v. Tribl. de Distrito,* 73 D.P.R. 959, 981 (1952). Véase, además, *Pueblo v. Henneman,* 61 D.P.R. 189, 194

(1942). El *propósito* de la Regla 16.1 de Procedimiento Civil, ante, es el "proteger a las personas ausentes de los efectos perjudiciales que pudiera tener la resolución del caso sin la presencia de ellos y evitar la multiplicidad de pleitos mediante un remedio efectivo y completo". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 412–413 (1982). Véanse, además: *Cepeda Torres v. García Ortiz*, ante; *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983); *Granados Navedo v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1988, Vol. I, pág. 92.

En *Hernández Agosto v. López Nieves*, ante, este Tribunal efectuó un *análisis histórico* de la referida Regla 16.1 con el propósito de lograr una definición clara de las palabras y conceptos que componen la misma. Se estableció que "interés común" —según surge de la Regla 16.1, ante— "no es cualquier interés en el pleito. Tiene que ser un interés de tal orden que impida la confección de un decreto sin afectarlo". (Enfasis suprimido.) Íd., pág. 607. A su vez se dispuso que "remedio completo" significa que es el "remedio entre las personas y entidades que ya son partes en el pleito y no al obtenible entre una parte y el ausente". (Énfasis suprimido.) Íd. Por último, se interpretó que la frase "sin cuya presencia no pueda adjudicarse la controversia" se refiere a la persona o entidad que debe hacerse parte en el pleito para no afectar su interés en el mismo, no obstante, ese interés afectado "tiene que ser de índole real e inmediata, al extremo de impedir la confección de un decreto adecuado". Íd., págs. 610–611.

Este Tribunal, *adicionalmente*, ha resuelto que "la determinación de si una parte debe o no acumularse dependerá de los hechos específicos de cada caso". *Granados Navedo v. Rodríguez Estrada II*, ante, pág. 605. En *síntesis*, la jurisprudencia puertorriqueña ha adoptado una interpretación pragmática de la Regla 16 de Procedimiento Civil,

32 L.P.R.A. Ap. III, para así poder "salvaguardar no sólo el interés de las partes en el litigio, sino también para vindicar el interés público de conservar los escasos recursos judiciales, evitar la multiplicidad de acciones y la posibilidad de adjudicaciones incompatibles". *Granados Navedo v. Rodríguez Estrada II*, ante, pág. 606. Véase *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991).

Por otro lado, no puede enfatizarse lo suficiente el hecho de que el defecto de parte indispensable *no* queda subsanado meramente demostrando que la parte indispensable, ausente del pleito, tuviera conocimiento o hubiere sido informada de la existencia del pleito. Si la parte es una indispensable, *dicha parte tiene que ser traída al pleito por la parte demandante*. La omisión de así hacerlo constituye una violación del debido proceso de ley. *Granados Navedo v. Rodríguez Estrada II*, ante. En cuanto a este aspecto, por último, es importante que se recuerde que el defecto de parte indispensable es uno de *carácter jurisdiccional* que puede ser levantado, por primera vez, a nivel apelativo. *Hernández Agosto v. López Nieves*, ante.

A la luz de lo anteriormente expuesto —*y manteniendo presente que los partidos políticos, conforme ha resuelto este Tribunal son personas jurídicas con capacidad para demandar y ser demandados, P.S.P. v. E.L.A.*, 107 D.P.R. 590, 592 (1978)— somos del criterio que resulta mandatoria e inevitable la conclusión de que los tres (3) partidos políticos aquí en controversia, esto es, el P.P.D., el P.N.P. y el P.I.P., *son partes indispensables en el caso de autos*, sin cuya presencia como demandados no se puede resolver el mismo. Veamos.

La demanda en el caso de autos va encaminada a declarar la citada Ley Núm. 22 inconstitucional porque, entre otros argumentos, le concede de forma exclusiva a los partidos políticos la potestad de promulgar, con cargo a fondos públicos asignados a tales efectos, sus definiciones de las fórmulas de Estadidad, Estado Libre Asociado e Indepen-

dencia respectivamente. Los demandantes apelantes alegan en su demanda que los tres (3) partidos políticos no deben ser los representantes exclusivos de las tres (3) fórmulas esbozadas en el plebiscito. Siendo ésta una de las principales contenciones de los demandantes, queda claro que los partidos políticos tienen un interés legítimo en el caso y se les tiene que incluir como parte en el pleito para que puedan salvaguardar sus derechos, ya que se está atacando directamente en la demanda su derecho a definir y promover la fórmula de *status* que defienden en el plebiscito según se lo reconoce la Ley Núm. 22, ante.

En adición, la demanda en cuestión, *entre otros remedios*, solicita que se le ordene a los comisionados electorales de los partidos políticos, *y a los tres (3) partidos políticos*, "que se abstengan de inmediato de efectuar cargos al fondo electoral asignado por la Ley Número 22 hasta la resolución de este litigio o de desembolsar cualquier dinero que hayan recibido por adelantado de la Comisión Estatal de Elecciones para llevar a cabo los propósitos enunciados en la Ley Núm. 22 ...". Demanda, pág. 15. Resulta, por tanto, inevitable concluir que los tres partidos antes mencionados son partes indispensables en este pleito ya que no se puede conceder el remedio que reclaman los demandantes sin la inclusión de estos como demandados. Ello así ya que se les estaría privando de su propiedad —la asignación de fondos para sus respectivas campañas publicitarias— sin el debido procedimiento de ley.

Realmente no podemos entender cómo la mayoría de los integrantes de este Tribunal hace caso omiso de esta situación. Tal parece que, como el avestruz, entierran sus cabezas en la tierra para no tener que enfrentarse con esta clara y dura realidad jurídica. *El hecho de que los Comisionados Electorales de estos tres (3) Partidos Políticos fueran incluidos, en la acción radicada, como demandados no subsana el defecto de parte indispensable antes señalado.* De la misma manera que un tribunal no adquiere jurisdicción en

un pleito sobre una corporación o una sociedad legal de gananciales mediante la inclusión como demandado, y el emplazamiento, del presidente de la corporación o de uno, o ambos, de los integrantes del matrimonio, tampoco se adquiere jurisdicción sobre un partido político en particular meramente incluyendo como demandado, y emplazando, al comisionado electoral de dicho partido. Conforme a nuestro ordenamiento jurídico, y a la jurisprudencia de este Tribunal, el comisionado electoral es un *funcionario* de la Comisión Estatal de Elecciones, 16 L.P.R.A. sec. 3003, que *meramente representa* los intereses de su partido ante dicha Comisión y es la persona que sirve de enlace entre la referida Comisión, el partido político y los electores de dicha agrupación política. *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 410 (1980). *Nada más y nada menos.* El comisionado electoral ciertamente *no* es el partido político. En vista a ello, la conclusión es inescapable: *el pleito del epígrafe adolece del defecto de parte indispensable.*

Ahora bien, y como es de todos conocido, el *remedio* que ha establecido jurisprudencialmente este Tribunal, al enfrentarnos a la ausencia de parte indispensable, no es la desestimación de la acción o recurso radicado sino que la devolución del caso al tribunal de instancia con el propósito de que la parte indispensable, ausente del pleito debido a la omisión y/o negligencia de la parte demandante, sea incluida como demandada y sea debidamente emplazada con el objetivo de que el tribunal obtenga jurisdicción sobre dicha parte. *Meléndez Gutiérrez v. E.L.A.*, 113 D.P.R. 811, 816 (1983).

En vista a ello, *procede entonces que nos cuestionemos*: ¿resulta procedente en el presente pleito, dado los hechos particulares y específicos del mismo, el mencionado curso de acción? *Contestamos la interrogante en la negativa.* Veamos por qué.

## III

Incuria

Los demandados, como parte de sus alegaciones, desde los comienzos de este pleito han planteado que la acción radicada por los demandantes Colón Martínez y Sánchez Vilella debe ser desestimada por haber actuado éstos con incuria en la radicación de la misma.

La defensa de incuria procede cuando la ley no establece un término prescriptivo para el ejercicio de una acción; su propósito es hacer justicia, vivificando con la equidad la prescripción establecida por la ley. *Piovanetti Doumont v. Martínez*, 99 D.P.R. 663 (1971). Como es sabido, el remedio de *injunction* que solicitan los demandantes en este caso es un *remedio en equidad* que le está vedado a quien haya actuado con incuria. *Olmeda Nazario v. Sueiro Jiménez*, 123 D.P.R. 294 (1989); *Asoc. de V. Villa Caparra v. Iglesia Católica*, 117 D.P.R. 346, 354 (1986). La incuria es una defensa afirmativa que implica dilación injustificada por parte del demandante, y perjuicio para la parte demandada. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 417 (1982).

La doctrina de incuria "no opera como un simple término prescriptivo en que el mero transcurso del tiempo es suficiente para impedir el ejercicio de la causa de acción. Su aplicación requiere, además del transcurso del tiempo, que se haya ocasionado *un perjuicio al demandado* o que se le haya puesto en desventaja por razón del tiempo transcurrido". *Hernández Agosto v. Romero Barceló*, ante. Véanse, también: *Pueblo v. Tribl. Superior*, 81 D.P.R. 904 (1960); *Alonso v. Tribl. Examinador de Médicos,* 74 D.P.R. 158, 165 (1952); *Jiménez v. Junta de Retiro*, 61 D.P.R. 171, 180 (1942).

En *Rivera v. Depto. de Servicios Sociales*, 132 D.P.R. 240, 247 (1992), expresamos *los criterios* a ser considerados

por el Tribunal, para determinar si una parte ha incurrido en incuria.

> debe mantenerse presente que no basta el mero transcurso del tiempo para que exista incuria, sino que es necesario evaluar otras circunstancias tales como la justificación, si alguna, de la demora incurrida, el perjuicio que ésta acarrea y el efecto sobre intereses privados o públicos involucrados. *J.R.T. v. A.E.E.*, 113 D.P.R. 564 (1982); *Pueblo v. Tribl. Superior*, 81 D.P.R. 904 (1960).

La discusión plebiscitaria, la cual sirvió de base a la citada Ley Núm. 22 de 1993, se originó en la campaña eleccionaria de 1992, en la cual el partido que resultó favorecido por el voto mayoritario de los electores en los comicios generales celebrados en noviembre de 1992, le había ofrecido al pueblo, como parte de su programa, la realización en el año 1993 de un plebiscito en el cual el Pueblo de Puerto Rico sería consultado sobre la fórmula política de su predilección, a saber: Estadidad, Estado Libre Asociado o Independencia. En junio de 1993, la Asamblea Legislativa *celebró vistas públicas* para conocer el sentir del pueblo de Puerto Rico en relación al plebiscito propuesto, vistas públicas a las cuales la prensa escrita, radio, y televisión de Puerto Rico le dio amplia cobertura. En relación con este punto cabe mencionar que los aquí demandantes, no obstante tener conocimiento de la celebración de dichas vistas públicas *no demostraron ningún interés en participar en dicho procedimiento, no solicitando turno alguno para deponer en las mismas.*

Más aun, luego de aprobada y firmada la citada Ley Núm. 22, *y conforme admitiera a preguntas nuestras la representación legal de los demandantes en la vista oral celebrada ante este Tribunal*, transcurrieron *dos (2) meses* sin que los demandantes tomaran acción judicial alguna en defensa de las posiciones que hoy sustentan ante este Tribunal. Al día de hoy, y a pesar de haber tenido la oportunidad de así expresarlo en la mencionada vista oral, *los demandantes no han aducido justificación alguna para su*

*inacción* durante el proceso pre-aprobación de la Ley y su demora en presentar sus alegaciones ante el foro judicial luego de aprobada la misma.

Somos del criterio que no puede haber duda alguna sobre el hecho de que la demora, o incuria, de los demandantes *efectivamente le causa perjuicio a los demandados*. Durante el tiempo transcurrido entre la aprobación de la Ley y la radicación de la demanda, tanto la C.E.E. como el Estado han incurrido en gastos sustanciales para la celebración de este plebiscito, no sólamente en términos de dinero, sino también en términos del esfuerzo y el tiempo invertido por muchas personas durante ese período de tiempo. Los partidos políticos, los cuales no fueron incluidos como parte en este pleito, también han incurrido en grandes inversiones de tiempo, dinero y otros recursos para presentar sus definiciones al pueblo y orientarles sobre la consulta. Atender ahora las reclamaciones tardías de los demandantes, podría resultar en la pérdida de todo ese tiempo, dinero y esfuerzo.

También hay que considerar, *de manera principal*, el interés del pueblo de Puerto Rico en este asunto. A través de todo este año se ha creado en el pueblo la expectativa de que podrá ejercer, el 14 de noviembre próximo, su derecho a expresarse sobre su futuro político, *lo cual no han podido hacer la gran mayoría de nuestros conciudadanos durante un cuarto de siglo.*[9] A última hora los demandantes *pretenden privar al pueblo* de su derecho a expresarse en las urnas, a pesar de que pudieron, y debieron, presentar sus argumentos mucho antes. *La doctrina de incuria está diseñada, precisamente, para evitar este tipo de daño.* De permitirse a los demandantes presentar su caso, *se estaría premiando la increíble indolencia y negligencia de los apelantes, en perjuicio de la gran mayoría de los*

---

[9] Si consideramos el hecho de que, en el Plebiscito celebrado en el año 1967, los menores de veintiún (21) años de edad no pudieron votar, tenemos que los ciudadanos puertorriqueños actualmente menores de cuarenta y ocho (48) años nunca han podido expresarse respecto al destino político de Puerto Rico.

*puertorriqueños*. Procede, pues, *desestimar* el recurso indicado a la luz de los graves daños que pueden ocasionarse a causa de su radicación injustificadamente tardía.([10])

## III

JUSTICIABILIDAD

La determinación de la inconstitucionalidad de un estatuto por parte de este Tribunal, en el ejercicio de su facultad de revisión judicial, presenta *una situación sumamente delicada*, pues conlleva la anulación de la decisión tomada por ese pueblo a través de sus representantes legítimamente electos —los legisladores— por la rama de gobierno que no responde periódicamente a dicho pueblo. Esta situación plantea, en todo sistema constitucional que se reputa democrático, la necesidad de *estrictos criterios de autolimitación judicial* para guiar la conducta de los tribunales en situaciones que requieren el ejercicio de su grave y delicada función de juzgar la validez constitucional de medidas legislativas. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 595 (1958). Esos criterios han sido recogidos en el *principio de justiciabilidad*, del cual son de particular relevancia y aplicación a este caso *dos (2) doctrinas*, a saber: la de legitimación activa y la de cuestión política.([11]) *En el caso de autos estos criterios de autolimitación judicial adquieren aún mayor relevancia porque el remedio solicitado por la*

---

([10]) La conclusión a que llega el Juez Asociado Señor Negrón García en su opinión disidente y concurrente, a los efectos de que la causa de acción de los demandantes no quedó debidamente configurada hasta la publicación de la proclama anunciando la celebración del plebiscito, nos parece insostenible. En primer lugar, tanto la demanda como el recurso de apelación radicado ante esta Curia impugnan la validez constitucional de la Ley del Plebiscito, no de su promulgación. En segundo lugar, es norma harto reiterada que en nuestra jurisdicción se presume el conocimiento de la ley. En tercer lugar, ambos demandantes son personas de experiencia e interés en los desarrollos políticos de nuestro pueblo y en nuestra vida pública en general, por lo que resulta difícil creer que necesitaran de la referida proclama para conocer de la celebración del plebiscito o del contenido de la ley.

([11]) Por tratarse de asuntos que es preciso discutir en el umbral del tribunal, resulta erróneo e improcedente mezclar o confundir los méritos de las controversias con su justiciabilidad.

*parte apelante implica a su vez que este Tribunal interfiera con el ejercicio del derecho al voto de más de dos (2) millones de puertorriqueños que están dispuestos y preparados a participar en el plebiscito pautado para el próximo día 14 de noviembre de 1993.*

## A. Legitimación activa

Este Tribunal ha resuelto que ni siquiera en situaciones en que la controversia planteada esté revestida de un gran interés público se puede ignorar las consideraciones prudenciales que impone la doctrina de legitimación. *E.L.A. v. Aguayo*, ante; *Hernández Torres v. Hernández Colón*, ante. La doctrina de legitimación activa[12] requiere que el promovente de una acción demuestre haber sufrido *un daño claro y palpable, real o inminente, no abstracto o hipotético*, y que pueda a su vez ser remediado por el Tribunal. *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 391-392 (1980). También es preciso que el promovente demuestre que va a ser *afectado de forma particular* como resultado de la alegada inconstitucionalidad y para ello *no* será suficiente que presente una queja generalizada (*generalized grievance*) compartida por igual o en una medida similar por toda la ciudadanía o por un segmento significativo de la misma. *Warth v. Seldin*, 422 U.S. 208, 220-222 (1975), citado en *Fund. Arqueológica v. Depto. de la Vivienda*, ante, a las págs. 391-392.

*Los apelantes no cumplen con estos importantes requisitos.* Según se desprende de sus alegaciones, los apelantes reclaman ser electores no afiliados con partido político alguno, a quienes la ley impugnada supuestamente les

---

[12] Los requisitos generales para la legitimación activa son los siguientes: (1) que el promovente de la causa de acción haya sufrido un claro y palpable daño; (2) que dicho daño sea real, inmediato y preciso, y el mismo no sea hipotético o abstracto; (3) que la causa de acción surge al amparo de la Constitución o de una ley, y (4) que exista una conexión entre el daño y la causa de acción ejercitada. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982).

ha privado de su derecho constitucional al voto y les impide el acceso al proceso plebiscitario al no brindarles una oportunidad "razonable" para poder organizarse como partido político. Los apelantes señalan que la negación de estos derechos surge como consecuencia de que ellos no están de acuerdo con las definiciones elaboradas por los partidos políticos sobre las fórmulas de *status* que figurarán en la papeleta el día del plebiscito.

En cuanto a la alegada privación de su derecho al voto, el daño alegadamente sufrido por los apelantes consiste, en síntesis, en que al no estar ellos de acuerdo con las "definiciones" elaboradas por los partidos políticos, la Ley Núm. 22, ante, les priva del derecho a votar por la "definición" específica de la fórmula política que *personalmente* prefieren, la cual según señalan difiere de las definiciones elaboradas por los partidos políticos. Los apelantes no alegan que existen otras fórmulas de *status* diferentes a las que habrá de considerar el electorado. Lo que desean es promover una definición de independencia o estado libre asociado distinta a la propuesta por los partidos políticos. Esto es *claramente insuficiente* para constituir un daño. El plebiscito dispuesto por la Ley Núm. 22, ante, es sobre fórmulas, no sobre definiciones. Son las tres (3) fórmulas de *status* establecidas en el Art. 1 de la Ley Núm. 22, ante, las que habrán de competir por el voto del pueblo en el plebiscito, no las definiciones redactadas por los partidos políticos.[13] En vista de que, según han admitido los apelantes, las fórmulas que favorecen estarán en la papeleta el día del plebiscito, los supuestos daños constitucionales que han de sufrir *son abstractos* y no justifican la continuación del

---

[13] El rol de los partidos en este proceso plebiscitario es eminentemente uno educativo. Como portavoces históricos de las fórmulas de *status*, la Asamblea Legislativa delegó en los partidos la oportunidad de definirlas, de manera que el debate público previo a la celebración del plebiscito se orientara hacia las fórmulas y no hacia otros asuntos. Además, resulta indudable que la participación activa de los partidos durante el debate público previo al plebiscito adelanta sustancialmente el propósito del Estado en que el electorado participe en la consulta.

pleito.([14]) Nada hay en la Ley Núm. 22, ante, que impida a los apelantes, de ellos desearlo, votar en el plebiscito del 14 de noviembre por la fórmula de *status* de su preferencia.

En relación al segundo de los derechos constitucionales alegadamente violados por la Ley Núm. 22, ante —el derecho de formar un partido político— ambos apelantes *alegan* ostentar el "poder de convocatoria" para participar en la formación de grupos de ciudadanos con el propósito de inscribir un partido por petición capaz de participar en la definición y defensa de una de las fórmulas contenidas en la Ley del Plebiscito. En virtud de ese *supuesto* "poder de convocatoria" que poseen, señalan que la ley impugnada no les ofreció suficiente notificación para organizar un partido político y poder así participar en el proceso plebiscitario junto a los otros partidos que estaban inscritos al momento de aprobarse la ley.

Como electores, los apelantes ciertamente tienen el derecho constitucional de asociarse con otras personas que compartan su criterio político y formar un nuevo partido. Sin embargo, esa facultad de convocatoria es un derecho que comparten con la generalidad de la ciudadanía. Por lo tanto, en ausencia de prueba sobre un daño particular y concreto a los apelantes, cualquier limitación que la Ley del Plebiscito pueda imponer a dicha facultad de convocatoria constituiría un interés generalizado, no un daño concreto que configure la legitimación activa para invocar el

---

([14]) Aun si asumiéramos, para propósitos de análisis, que la Ley Núm. 22, ante, priva a los demandantes de su derecho al voto en el plebiscito, ¿cuál, si alguno, sería el daño real que tal violación de su derecho constitucional les ocasionaría a ellos? Los apelantes no lo han podido explicar a nuestra satisfacción. Contrario a lo que ocurriría en una elección general —en la que se eligen las personas que han de ocupar cargos públicos y administrar el gobierno por los próximos cuatro (4) años, en cuyo caso la violación del derecho al voto produciría como daño real y concreto el que la persona que ha sido privada de ese derecho constitucional tendrá que vivir por cuatro (4) años sometida a un gobierno administrado por un grupo de personas en cuya elección no participó— el hecho de no participar en el plebiscito propuesto no produce consecuencia jurídica alguna, porque el propio plebiscito no la produce. Ello es así, en vista de que el evento electoral pautado para el 14 de noviembre es uno de naturaleza puramente consultiva y es, por lo tanto, jurídicamente distinguible del proceso eleccionario general.

poder de revisión judicial. Sin embargo, *los apelantes no han siquiera alegado haber hecho gestión alguna, antes o después de aprobada la Ley Núm. 22, ante, dirigida a organizar tal partido político.* De hecho, encontramos curioso que a pesar de que los apelantes son figuras públicas con larga experiencia en asuntos relacionados con la política en Puerto Rico, en más de veinte (20) años no han ejercitado su "poder de convocatoria" y no han realizado gestión alguna para aglutinar fuerzas políticas en defensas de las fórmulas de *status* de su preferencia.[15] Ante tal situación nos resulta forzoso concluir que los apelantes no han sufrido daño particular alguno que les confiera legitimación activa para incoar esta acción.[16]

Los dos (2) argumentos de los apelantes que hemos examinado, bajo la doctrina de legitimación activa, adolecen de una falla común. Por tratarse de un asunto que hay que discutir y resolver en el "umbral" del Tribunal, *resulta erróneo como metodología jurídica mezclar o confundir los méritos de las controversias con su justiciabilidad.* Eso es precisamente lo que hacen los apelantes en sus argumentos al respecto. *Los apelantes parten del error conceptual de considerar que el daño que requiere la doctrina de legitimación activa equivale a la alegada violación del derecho invocado.* Expresan, que "[e]l daño ... consiste en que a virtud de las disposiciones de la ley ... ellos se ven privados absolutamente de votar .... El daño en este caso ... consiste en la privación al derecho de expresión y asociación de los demandantes apelantes".[17]

Su argumento resulta *circularmente erróneo.* Podemos resumirlo de la siguiente forma:

---

[15] Sin embargo, los apelantes han organizado una agrupación con el propósito de fomentar activamente la *abstención* electoral en el plebiscito del 14 de noviembre.

[16] Obsérvese que aun cuando los apelantes hubiesen creado un partido político, lo hubiesen hecho para promover su *particular* definición de las fórmulas de *status* de su preferencia. Ambas fórmulas ya están en la papeleta. Por lo tanto, su contención resultaría abstracta.

[17] Véase el Escrito y alegato de apelación, pág. 12.

> Para que el tribunal pueda resolver si a la parte demandante se le han violado sus derechos constitucionales, es necesario decidir si ésta tiene legitimación activa, es decir, *si sufre un daño concreto*. Y la parte demandante dice sufrir un daño concreto porque se le han violado sus derechos constitucionales.

Como podemos notar, la argumentación sobre legitimación se convierte, entonces, en una discusión de los méritos de las controversias constitucionales. Eso es precisamente lo que este Tribunal no puede entrar a dilucidar hasta tanto se demuestre que los demandantes han sufrido un daño concreto independiente para poder tener legitimación.

Por último, y en su *vano intento* por reclamar legitimación activa, los apelantes alegan que la Ley del Plebiscito viola la Declaración de Derechos y Prerrogativas de los Electores contenida en el Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051. Apoyan su contención en que el mencionado Art. 2.001 de dicha ley confiere legitimación activa a "los electores" para promover cualesquiera acciones legales al amparo de esa Declaración de Derechos. Este artículo resulta *inaplicable* a la situación presente.

Naturalmente, en vista de que la doctrina de legitimación tiene como propósito evitar conflictos innecesarios entre la Rama Judicial y las ramas políticas del Gobierno, resulta innecesaria la aplicación de la misma en aquellos casos en que existe una autorización legislativa para la adjudicación de controversias en torno a la constitucionalidad de cierto estatuto. En tales situaciones podríamos decir que, al haber una autorización legislativa para el ejercicio de la revisión judicial, no existe posibilidad de conflicto alguno entre las distintas ramas de gobierno, ni riesgo de que el ejercicio por parte de este Tribunal del poder de revisión judicial atente contra el fundamental principio de separación de poderes constitucionales. *Sin embargo, no es cierto que exista tal autorización legislativa en la Ley Electoral vigente.* De su faz, el Art. 2.001 de dicha

ley, ante, *únicamente* reconoce legitimación para incoar litigios por violaciones a los preceptos y derechos estatutarios establecidos en el propio Art. 2.001. El referido artículo de ley guarda el más *absoluto silencio* en cuanto a autorizar acciones legales fundamentadas en la Constitución. No puede este Tribunal inferir una autorización estatutaria para reclamar la inconstitucionalidad de una ley a menos que ésta conste expresamente en el estatuto. *Hacer lo contrario sería echar por la borda nuestra jurisprudencia en materia de separación de poderes y justiciabilidad.*

Al no existir autorización legislativa para la dilucidación por los tribunales de la controversia constitucional planteada en el presente recurso, *resulta inescapablemente necesario que apliquemos en todo su rigor la doctrina de legitimación activa*, incluyendo su componente relativo a las consideraciones prudenciales que requieren la demostración de un daño concreto, particular, no generalizado, sufrido por la parte promovente.

La conclusión a que ha llegado este Tribunal al reconocer a los apelantes legitimación activa bajo las disposiciones de la Ley Electoral de Puerto Rico, *no solo resulta enteramente errónea, sino que ha sido sustentada sobre un argumento totalmente engañoso*. La opinión *Per Curiam* emitida por este Foro el pasado día 4 de noviembre señala que el Art. 2.001 de la Ley Electoral, ante, "le concede la capacidad para promover toda acción legal para salvaguardar su derecho al voto universal, igual, directo y secreto". *Sánchez y Colón v. E.L.A. I*, ante, pág. 446. Aunque la Opinión del Tribunal no señala a quién se "le concede capacidad", lo cierto es que la Declaración de Derechos y Prerrogativas de los Electores contenida en el citado Art. 2.001 de la referida Ley Electoral concede "a los electores la capacidad para iniciar o promover cualesquiera acciones legales *al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ...*". 16 L.P.R.A. sec. 3051.

Sin embargo, por medio de un translúcido juego de palabras, la mayoría de este Tribunal *ha pretendido dar la impresión* de que el referido artículo de la Ley Electoral concede autorización legislativa para que el foro judicial obvie las consideraciones prudenciales que es indispensable aplicar al adjudicar controversias constitucionales. En síntesis, la Mayoría *ha tratado de representar* que como uno de los derechos garantizados en la referida Ley Electoral de Puerto Rico es el derecho al voto, y ese derecho, es a su vez, "un derecho de estirpe constitucional", *de alguna forma misteriosa y no explicada en ninguna parte del estatuto o de la Opinión mayoritaria*, la Asamblea Legislativa ha querido, por medio de la citada sección de la Ley Electoral, conferir legitimación activa para invocar el derecho constitucional al voto e impugnar procesos que surgen y tienen lugar por virtud de *otros estatutos*. No podemos refrendar tan errada y libertina interpretación estatutaria.

Por el contrario, si la reclamación de los apelantes fuera una estatutaria, al amparo del citado Art. 2.001, la misma quedaría derrotada por la propia Ley del Plebiscito, ello en vista de que ante el alegado conflicto entre la ley general (Ley Electoral de Puerto Rico) y la ley especial (Ley del Plebiscito), prevalece la última. *Córdova & Simonpietri v. Crown American*, 112 D.P.R. 797 (1982); *Sierra v. Tribl. Superior*, 75 D.P.R. 841 (1954); *París v. Canety*, 73 D.P.R. 403 (1952). La propia Ley Núm. 22 señala en su Art. 6 (1993 Leyes de Puerto 104–105) que para efectos del plebiscito del próximo 14 de noviembre, la Ley Electoral es supletoria y sólo aplican las disposiciones de ella que no sean incompatibles con lo provisto en la Ley del Plebiscito. En resumen, los apelantes necesitan "algo más" que la Ley Electoral de Puerto Rico para tener legitimación activa para incoar este pleito.[18]

---

[18] Resulta errónea la conclusión a que llega el Juez Asociado Señor Negrón García en su opinión disidente y concurrente, al sostener la ausencia de conflicto entre la Ley Electoral y la Ley del Plebiscito como razón para que la ley especial no

## B. Cuestión política

La parte demandante en el recurso ante nuestra consideración pretende que este Tribunal se inmiscuya en la ardua tarea de regular la participación ciudadana en un proceso político, *determinación que a todas luces constituye una intromisión judicial indebida en el proceso electoral puertorriqueño*. Ante esta realidad, estamos claramente ante una *cuestión política* no susceptible de determinación judicial porque su resolución corresponde propiamente al proceso político que se produce en las otras ramas del Gobierno —ejecutivo y legislativo— y no al poder judicial. *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Baker v. Carr*, 369 U.S. 186 (1962); *Powell v. McCormack*, 395 U.S. 486 (1969).

Los criterios judiciales, los cuales *todos* están presentes en esta controversia, para determinar lo que constituye una cuestión política son:

1. La Constitución delega expresamente el asunto en controversia a otra rama del gobierno;
2. No existen criterios o normas judiciales apropiadas para resolver la controversia;
3. Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales;
4. Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno;
5. Hay una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente;
6. Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del gobierno sobre un punto.[19]

---

prevalezca sobre la ley general. Incluso si asumiéramos, por el momento, que la Ley Electoral confiere legitimación activa para reclamar, en el proceso plebiscitario, los derechos garantizados en dicho estatuto, la ausencia de conflicto entre los dos (2) estatutos necesariamente significaría la ausencia de causa de acción bajo la Ley Electoral.

[19] Estos criterios fueron esbozados por el Tribunal Supremo de los Estados Unidos en *Baker v. Carr*, 369 U.S. 186 (1969), y acogidos en nuestra jurisdicción en

De un estudio de las controversias planteadas ante nuestra consideración surge que la naturaleza de la misma gira en torno a la *inconformidad* con las "definiciones" de los conceptos políticos que concurren a la consulta plebiscitaria del 14 de noviembre de 1993. Existe un deseo por la parte demandante de que en la papeleta a presentarse al electorado en dicha consulta esté definida, desde su óptica particular, la fórmula política que ellos profesan; cuestionan además, la decisión o sabiduría legislativa de seleccionar las fórmulas políticas que concurrirán a la consulta y la delegación hecha a los partidos políticos que existen en Puerto Rico de expresarle al pueblo el contenido de las mismas.

Primeramente debemos dejar claro que nos enfrentamos a una controversia que envuelve *un proceso evidentemente político* como lo es un referéndum, consulta o plebiscito. La Asamblea Legislativa de Puerto Rico es la encargada de crear y dar forma al mecanismo mediante el cual el Pueblo expresará su preferencia sobre el *status* político; su poder se deriva de la Constitución de Puerto Rico para legislar en asuntos electorales. *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980). En *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978), expresamos que la Legislatura tiene la facultad de establecer plebiscitos no discriminatorios para examinar el sentir del pueblo. Mediante la aprobación de la Ley Núm. 22 de 1993, ante, la Asamblea Legislativa, en ejercicio de dicho poder, decidió auscultar la preferencia del pueblo entre las tres (3) fórmulas de *status* tradicionales en Puerto Rico.[20] La corrección o deseabilidad de so-

---

*Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986).

[20] En *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978), se reconoció que las fórmulas de la Estadidad, Autonomía e Independencia son las únicas opciones de *status* discutidas en el Puerto Rico moderno; a esos efectos en la opinión concurrente del Juez Asociado Señor Negrón García, a la página 624, se expresó:

"Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomando

meter al electorado a dicho proceso *no* debe estar sujeta a revisión judicial, ya que es una prerrogativa legislativa y no le corresponde a este Tribunal examinar la sabiduría de una ley. C. *Famania v. Corp. Azucarera de P.R.*, 113 D.P.R. 654 (1982).

La determinación de la Asamblea Legislativa de darle participación a los partidos políticos en el proceso electoral *no* es una ajena a nuestro sistema político. Véanse: *Fuster v. Busó*, 102 D.P.R. 327 (1974); *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49 (1976); *P.P.D. v. Gobernador*, 111 D.P.R. 8 (1981); *Rodríguez v. Popular Democratic Party*, 457 U.S. 1 (1982). A esos efectos, en *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 638 (1984), expresamos:

> En nuestra democracia los partidos políticos son indispensables para su funcionamiento. Están investidos de poderes cuasi gubernamentales. Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos. El subsidio a través del fondo electoral para financiar sus actividades es un ejemplo vivo de esa característica pública. Véase *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 610 (1978).

Es importante en este punto aclarar que las definiciones elaboradas por los partidos políticos de sus respectivas fórmulas *no* están comprendidas y *no* son parte de la Ley de Plebiscito de 1993, ante; las mismas constituyen una explicación partidista de las fórmulas de *status* y no una definición legislativa de las mismas.

Independientemente de quien defina o explique las fórmulas concursantes en el plebiscito, *no es función de este Tribunal redactar o pasar juicio sobre la corrección o contenido de las mismas.* No vemos cómo este Tribunal pueda

---

cuerpo colectivo, y previa inscripción, participando como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338 (1970)."

pasar juicio sobre qué definición se le puede dar a la fórmula Estadista, Estadolibrista o Independentista, *ya que esto le corresponde a los poderes políticos del gobierno y en última instancia al pueblo de Puerto Rico*. No existen criterios judiciales para determinar lo que debe contener una papeleta electoral. *No debemos dar cabida a un recurso basado en diferencias de criterio sobre el significado de cada fórmula política de status*; dicha discusión no puede ser trasladada de las Ramas Legislativas y Ejecutivas a la Rama Judicial.

En adición, *cabe señalar que este Tribunal no puede decidir este recurso sin hacer una determinación de política pública*; la decisión de cuántas fórmulas van a estar contenidas en la papeleta, de si las definiciones dadas por los partidos van a ser incluidas en la papeleta y el alcance de la participación de otras entidades, *son cuestiones reservadas a las otras ramas de gobierno; las mismas están en mejor posición para tomar esa decisión*. Como correctamente expresara el entonces Juez Presidente de este Tribunal, Hon. Luis Negrón Fernández, en el voto particular que emitiera en *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338, 339 (1970): "no se debe trasladar al foro judicial el debate en torno al status político de Puerto Rico". Véase, además, Voto particular del Juez Asociado Señor Santana Becerra, pág. 351.

Nuestra función *debe limitarse* a examinar si la ley es neutral —no discriminatoria— en relación con las tres fórmulas de *status*. Claramente la citada Ley 22 *es una neutral*; ésta le brinda al electorado la oportunidad de votar por su fórmula predilecta de *status*, y permite la participación, *en igualdad de términos*, de todos los electores cualificados en el proceso electoral.

Por último, no debemos pasar por alto el *potencial de confusión* que causaría esta Curia al "enmendar judicialmente" el proyecto de ley que viabiliza el Plebiscito del 14 de noviembre de 1993. El cambiar las "reglas de juego" en

la última etapa de un proceso electoral es fuente de una gran confusión; a esos efectos en *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, ante, pág. 263, expresamos:

> Como cuestión de rigor debe quedar clara constancia, en adición a todo lo anteriormente expuesto, de *que la impugnación constitucional ha llegado ante nosotros a tan corto plazo de la fecha fijada para las próximas elecciones*, que tanto la campaña política como los procesos preparatorios electorales se encuentran ya sumamente adelantados. *La intervención judicial en el curso normal de acontecimientos de tanta trascendencia y profunda significación social, a juicio nuestro, no puede ser obtenida a fecha tan cercana a su culminación, sino solo como urgente y extraordinario remedio ante una clara y opresiva violación constitucional.* En el presente caso no se ha demostrado que sea esa la situación.
>
> Reconocemos que los apelantes iniciaron y tramitaron sus causas con la mayor premura que le permitieron las circunstancias. *Lo cierto es, sin embargo, que la controversia por ellos planteada resulta, en estos momentos, de inmanejable solución judicial. Girando toda ella en torno a una legislación —por sus propios términos— de limitada aplicación, legislación aprobada, además, con carácter de urgencia para hacer frente a una grave situación con ella argüiblemente remediada, no advertimos razón alguna que justifique detener a estas alturas el proceso eleccionario, advertidas las profundas consecuencias que tanto en el plano constitucional como en el social inevitablemente arrastraría tal actuación.* (Énfasis suplido y escolio omitido.)

Somos del criterio que este Tribunal no debe, basándose en un pleito que a todas luces resulta frívolo y tardío, interferir con la expresión del pueblo emitida mediante el sufragio universal ordenando a la Comisión Estatal de Elecciones interpretar la papeletas en blanco como un voto de protesta contra las fórmulas tradicionales de *status.* *¿Que criterio judicial —o psíquico— sigue esta Curia para forzar una interpretación o significado específico a la expresión del pueblo?*

## IV

Méritos de la reclamación

Las reclamaciones de los apelantes bajo los derechos a la libertad de expresión y asociación, y a la igual protección de las leyes tienen una misma fuente: el derecho al voto.([21]) El derecho al voto es, sin duda alguna, uno de los derechos más fundamentales en nuestro ordenamiento constitucional. *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173 (1979). Nuestra Constitución, en su Art. II, Sec. 2, L.P.R.A., Tomo 1, ed.1982, pág. 261, dispone que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Sin embargo, ni el derecho al voto ni el derecho a asociarse para propósitos políticos son derechos absolutos. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). En efecto, la Asamblea Legislativa deriva de la Constitución un *amplio margen de autoridad* para legislar en asuntos de materia electoral. *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, ante, a la pág. 256 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 744 esc. 2 (1976).

Toda ley electoral *invariablemente impone* sobre los electores *algún tipo* de restricción. Es *inevitable* que las disposiciones de un estatuto electoral afecten, *en alguna medida*, los derechos individuales de voto y de asociación de los electores. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Por lo tanto, resultaría *poco práctico* pretender so-

---

([21]) El argumento sobre la igual protección de las leyes se basa en que la Ley Núm. 22, ante, alegadamente crea una clasificación sospechosa entre los votantes afiliados a partidos políticos y los no afiliados que afecta su derecho fundamental al voto. Los argumentos de violación a la libertad de expresión y asociación también se basan en la alegada limitación al derecho al voto.

meter cada reglamentación del derecho al voto a un escrutinio judicial estricto o requerir que el estatuto sea lo menos oneroso posible para adelantar un interés estatal apremiante. *Burdick v. Takushi,* 504 U.S. 428 (1992). Hacer tal cosa sólo lograría que los estados se vean impedidos de sostener y operar eventos electorales que sean justos y eficientes. Íd. Es precisamente por eso, que el Tribunal Supremo de los Estados Unidos ha resuelto que la creación de barreras estatutarias que limiten el número de candidaturas de entre las cuales los electores puedan escoger, *no* impone o compele la aplicación de un escrutinio estricto. *Bullock v. Carter,* 405 U.S. 134, 143 (1972).[22] A la *misma conclusión* ha llegado este Tribunal en *P.P.D. v. Planadeball Poggy,* 121 D.P.R. 570, 574 (1988), y en *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* ante.[23] Más recientemente, el Tribunal Supremo de los Estados Unidos *descartó abiertamente* la suposición de que una ley que impone cualquier restricción sobre el derecho al voto debe estar sujeta a escrutinio estricto. *Burdick v. Takushi,* ante.[24] Indicó que en tales casos, los tribunales deben realizar un balance de intereses entre el alcance del daño alegado a los derechos de los demandantes y los intereses establecidos por el Estado, teniendo en consideración hasta qué punto estos intereses hacen necesario afectar los derechos de los demandantes:

---

[22] Véase, también: *Erum v. Cayetano,* 881 F.2d 689, 692 (9no Cir. 1989); *Lightfoot v. E.U.,* 964 F.2d 865, 869 (9no Cir. 1992).

[23] *P.P.D. v. Planadeball Poggy,* 121 D.P.R. 570 (1988), trató de una impugnación a la prohibición estatutaria a que un alcalde destituido de su puesto por cometer actos ilegales aspire nuevamente al puesto. *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248 (1980), trató de una impugnación a un sistema de votación desigual para ciertos tipos de electores.

[24] En *Burdick v. Takushi,* 504 U.S. 428 (1992), se rechazó un ataque constitucional a la legislación del Estado de Hawaii que prohibía la columna de nominación directa (*write-in*) para que los electores pudieran escribir y votar directamente por el candidato de su preferencia, si era diferente al impreso en la papeleta. Tal y como hacen los apelantes en el caso de epígrafe, el demandante alegó que dicha legislación infringía sus derechos constitucionales de expresión y de asociación. En particular alegó que la prohibición le privaba de la oportunidad de emitir un voto significativo, lo obligaba a votar por posiciones con las que no estaba de acuerdo y discriminaba contra él a base del contenido del mensaje que quería transmitir a través del voto.

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." ... *But when a state election law provision imposes only "reasonable, non discriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.* (Énfasis suplido y cita omitida.) *Burdick v. Takushi*, ante, pág. 433.

Conforme a estas expresiones, resulta necesario examinar cuál es precisamente la alegación de los apelantes para luego determinar si las restricciones sobre el derecho al voto son severas o razonables, y si las mismas están justificadas. Como ya hemos señalado, la alegada restricción del derecho al voto de los apelantes consiste en que las "definiciones" de Estado Libre Asociado e Independencia, redactadas por los partidos políticos que históricamente han defendido dichas fórmulas de *status*, no concuerdan con las que ellos profesan. *Tal alegada restricción no es una restricción "severa" al derecho al voto de los apelantes.* En primer lugar, la Ley del Plebiscito no les impide votar por su fórmula preferida de *status*. En efecto, así lo han admitido los apelantes en la demanda juramentada, al indicar que uno favorece la independencia y otro el Estado Libre Asociado. En otras palabras, los apelantes no defienden una cuarta fórmula de *status*, sino dos (2) de las tres (3) fórmulas incluidas en la consulta. La Ley del Plebiscito no contiene disposición alguna que les impida votar por la fórmula de su preferencia, y luego intervenir en el proceso de análisis y discusión o procedimientos posteriores dirigidos a hacer valer el deseo del pueblo de Puerto Rico en cuanto al *status* político.

Otro factor que abona a la aseveración de que la Ley en cuestión no contiene intromisiones severas con los derechos de los apelantes, es el hecho de que la Ley Núm. 22 de

1993, ante, *no* produce ninguna consecuencia jurídica.(25) Llegamos a esta conclusión luego de un análisis de la misma en el cual nos percatamos que el único efecto que produce la Ley es que el Gobernador de Puerto Rico viene obligado a certificar los resultados del plebiscito al Presidente y al Congreso de los Estados Unidos, y a la Asamblea Legislativa de Puerto Rico. Art. 27 de la Ley Núm. 22, ante, Leyes de Puerto Rico 112. *De esto surge el derecho de todos los partidos y de todos los electores no afiliados —tanto los que represente la fórmula ganadora como los restantes— de ejercer su "derecho al cabildeo" con las ramas políticas del gobierno de Estados Unidos y Puerto Rico.* Tan es así, que uno de los apelantes admitió, a preguntas del Juez suscribiente —a través de su representación legal, Lcda. Celina Romaní, en la vista oral celebrada el día 3 de noviembre— *que reconocía que los apelantes tenían el derecho al cabildeo antes, durante y después del plebiscito.* Teniendo este derecho a cabildear no se puede aseverar —independientemente del resultado del Plebiscito— que la infracción a los derechos fundamentales de los apelantes sea una severa, por lo tanto, *procede que apliquemos el escrutinio racional a la situación que plantea el caso de autos.*

Por otro lado, *existen razones legítimas y apremiantes para que el Estado haya establecido, en la forma en que lo*

---

(25) En *Barbosa v. Sánchez Vilella*, 293 F. Supp. 831, 833 (D. Puerto Rico 1967), el Tribunal Federal para el Distrito de Puerto Rico ante una impugnación de la Ley del Plebiscito de 1967 —la cual es muy similar a la del Plebiscito de 1993— resolvió que la celebración del mismo no tenía consecuencia final con relación al status de la isla *y a esos efectos* expresó:

"...regardless of the degree to which the plebiscite might blind the Puerto Rican Legislature, it concededly does not bind the Congress of the United States. As a corollary thereto, the legal status, right or American citizenship of all the residents of Puerto Rico will remain unchanged despite the plebiscite.

"The holding of the plebiscite will in no way change the juridical or political status of the plaintiffs or anyone else in Puerto Rico. Prior to the alteration of the status or rights of any person in Puerto Rico whatever change is later voted by the Puerto Rican Legislature must also be concurred in by the Congress of the United States."

Esto fue reiterado recientemente en *New Progressive Party v. Hernández Colon*, 779 F. Supp. 646, 655 (D. Puerto Rico 1991).

*hizo, el procedimiento o mecanismo para el Plebiscito.* El Estado tiene un *interés legítimo* de conocer la preferencia del Pueblo sobre las tres (3) fórmulas tradicionales de *status. El propósito primordial de la legislación es obtener una expresión electoral del Pueblo de Puerto Rico, para dar inicio al proceso de definición del futuro político de nuestro país. Este es, sin duda alguna, un asunto de fundamental importancia en la vida del país.* Las Ramas Ejecutiva y Legislativa han determinado como cuestión de política pública, que este asunto es uno de primordial importancia y que debe comenzar a resolverse de inmediato. *Tal determinación de política pública por parte de las ramas políticas del gobierno está fuera de nuestro alcance al hacer ejercicio del poder de revisión judicial.* Además, los partidos políticos en Puerto Rico están en efecto fundamentados sobre las fórmulas de *status* político que cada uno favorece. Es por eso, que con el propósito de orientar y entusiasmar al pueblo a participar en el plebiscito, se determinó que los partidos políticos que históricamente han defendido cada alternativa son los más capacitados para proponer al pueblo definiciones de cada fórmula.(26)

Sin embargo, las definiciones *no* aparecen en la Ley del Plebiscito, ni en la papeleta en que el pueblo habrá de votar. Lo primero garantiza que las fórmulas *no* serán afectadas por una mayoría legislativa que responda a un partido que defiende una fórmula particular. *Si la Asamblea*

---

(26) También la jurisprudencia reconoce a los partidos políticos como los principales vehículos de la democracia representativa. *EU v. San Francisco Democratic Comm.*, 489 U.S. 214 (1989), y *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980), donde, citando el caso *Dávila v. Secretario de Estado*, 83 D.P.R. 186 (1960), opinó este Tribunal Supremo lo siguiente:

"Es a través de partidos políticos que no solamente la opinión pública se traduce en acción, sino que un continuo enlace entre las autoridades gobernantes y los componentes del estado se mantiene. Los partidos siempre han estado fuera de la estructura de gobierno, sin embargo ellos han constituido su sangre, su carne y su sistema nervioso. Aparte de una conciencia sana y activa, aparte de la educación moral y política del pueblo, aparte de los vehículos de publicidad, -prensa, radio, las plataformas—que se combinan para mantener al pueblo unido e informado, un hecho se ha reconocido desde el principio como absolutamente esencial a una democracia eficiente: el partido político moderno."

*Legislativa hubiera definido las fórmulas se podría haber cometido una grave injusticia al someter las fórmulas de Estado Libre Asociado e Independencia al arbitrio partidista irrestricto y a la conveniencia de la mayoría parlamentaria.* Lo segundo asegura que aquellas personas con *concepciones diferentes* de la fórmula que prefieran, *puedan votar por ella sin atarse a la definición propuesta por los partidos políticos.* En adición, *el Estado señala ante nosotros consideraciones prácticas que ameritan la decisión de no colocar definiciones en la papeleta. Cada fórmula puede tener variantes en su definición final.* Si se vota por definiciones, habría que dar espacio a una amplia gama de propuestas que diluirían el voto, lo cual haría casi imposible determinar qué fórmula favorece el pueblo, impidiendo así la consecución del propósito perseguido por la Ley del Plebiscito: determinar la preferencia del pueblo entre las tres fórmulas de status tradicionales, independientemente de las numerosas variaciones o mutaciones que la definición de cada una pueda presentar.

En conclusión, la Ley del Plebiscito satisface el criterio de *Burdick v. Takushi*, ante, pues las restricciones que pueda imponer al derecho al voto de los demandantes son eminentemente razonables, y por tanto los fundamentos en apoyo de las mismas son suficientes para sostener su validez constitucional a base del escrutinio racional. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975).

## V

"Corrección y Procedencia" del remedio concedido por el Tribunal

Lo importante en una consulta de esta índole *es que el voto emitido sea significativo para el Estado, y que el elector pueda expresarse claramente sobre lo que se le consulta y no sobre lo que él quisiera que se le consultara.* En nues-

tra jurisdicción se ha reconocido la existencia de un "interés específico —cognocible y de alta jerarquía en el desarrollo maduro de nuestra democracia— *de inyectarle certeza y confianza en la fase de adjudicación al voto*, evitando que se generen controversias en torno a cuál fue la verdadera intención de un elector". *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 428–429 (1980). Véase, además, *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980).

De ser la Ley Núm. 22 inconstitucional, *posición que rechazamos*, el "remedio" concedido por la mayoría de este Tribunal en la opinión *Per Curiam* del 4 de noviembre de 1993, *no* cura *ni* subsana el daño alegado por los aquí demandantes-apelantes. El "remedio" que se les otorga no fue el que ellos solicitaron en su demanda, a saber, un *injunction* permanente para evitar la celebración del plebiscito. De hecho, los demandantes han solicitado reconsideración de la decisión mayoritaria emitida.

Por otra parte, somos del criterio que el "remedio" en cuestión —votar en blanco como signo de protesta a las tres (3) definiciones de *status* sometidas por los tres (3) partidos políticos— puede dar lugar a la comisión de fraude en la votación a celebrarse el 14 de noviembre. Ello en vista de que puede resultar imposible para la Comisión Estatal de Elecciones evitar que las papeletas depositadas en blanco sean "marcadas" por funcionarios electorales inescrupulosos. Esta preocupación *no* es nuestra; la misma ha sido planteada formalmente ante este Tribunal *tanto por* el codemandante Sánchez Vilella *como por* la F.U.P.I. en las mociones de reconsideración que ambos han radicado.

A su vez, la adjudicación de la papeleta en blanco como un voto de protesta *afecta seriamente y diluye el efecto y consecuencia de los votos que se emitan a favor de cualesquiera de las tres (3) fórmulas de status que históricamente se han reconocido en Puerto Rico ya que, en vista de que se tienen que contabilizar las mismas, el por ciento de los vo-*

*tos emitidos que será adjudicado en relación con las tres (3) fórmulas de status se verá reducido.* En adición, la alternativa de emitir una papeleta en blanco en el plebiscito habrá de producir un renglón de votantes sobre los cuales el Estado no tendrá forma de conocer sus preferencias entre las fórmulas de *status* tradicionales. Esto *derrota el propósito* que persigue el estatuto, pues será imposible interpretar el significado de una papeleta depositada en blanco.

Por último, el "remedio" concedido, el cual asigna determinado significado a las papeletas así depositadas, constituye, a su vez, una *interferencia sustancial* por parte de este Foro con los derechos que la Ley Electoral de Puerto Rico confiere a todo elector. Bajo la Ley Electoral de Puerto Rico, todo elector tiene el derecho de entregar su papeleta en blanco si así lo desea, y de hacerlo por las razones que mejor entienda. Este derecho estatutario que surge de la Ley Electoral de Puerto Rico y que de manera supletoria aplica a todo elector en el proceso plebiscitario, está siendo coartado por la actuación de esta Curia al imponer determinado significado a las papeletas depositadas en blanco y al ordenar que las mismas sean contadas e interpretadas a tono con éste. Esta actuación del Tribunal constituye una *enmienda judicial* a lo dispuesto por nuestros estatutos electorales, *realizada la misma sin siquiera haber determinado el Tribunal la inconstitucionalidad del estatuto aquí impugnado.*(27)

---

(27) Finalmente, y en relación con el curso decisorio que a través de todo este procedimiento ha seguido el Juez Asociado Señor Negrón García, realmente resulta difícil encontrar palabras para describir el mismo. De momento se nos ocurre pensar en "contradictorio e ilógico".

¿Cómo es posible que este compañero Juez haya *concurrido* con el "remedio" que proveyó la Mayoría en su opinión *Per Curiam* de fecha 4 de noviembre de 1993 cuando entendía que la Ley Núm. 22, ante, es "discriminatoria, asfixia el derecho a la libre expresión, restringe la libertad de asociación y coacciona y anula el derecho al voto de los demandantes apelantes, los electores Roberto Sánchez Vilella y Noel Colón Martínez, al igual que la de aquellos electores miembros de la interventora apelante *Federación de Universitarios Pro-Independencia* (F.U.P.I.)".? (Énfasis en el original.) *Sánchez y Colón v. E.L.A. I,* 134 D.P.R. 445, 452 (1993), opinión disidente y

"Cosas extrañas, veredes", dijo algún filósofo en tono jocoso. *Ojalá que en los próximos quinientos años, que acabamos de comenzar, las próximas generaciones no sean testigos de actuaciones judiciales similares.*

concurrente del Juez Asociado Señor Negrón García.

La contestación a la interrogante resulta obvia: sólo un jurisconsulto que está un tanto desorientado. Evidencia fehaciente de ello lo constituye el hecho de que unos días más tarde —quizás apercibido de su error por otros— "reconsidera" su contradictoria e ilógica posición original y, ahora, expresa que *paralizaría* el "denominado *Plebiscito sobre el Status Político de Puerto Rico*" por ser el mismo *"Inconstitucional"*. (Énfasis en el original.)